298 So.2d 149 (1974)
Thomas Griffin HAYNES et ux.
v.
BATON ROUGE GENERAL HOSPITAL et al.
No. 9860.
Court of Appeal of Louisiana, First Circuit.
June 28, 1974.
Rehearing Denied August 13, 1974.
Writ Refused October 25, 1974.
*150 George R. Covert, Baton Rouge, for appellants.
Robert L. Kleinpeter, Baton Rouge, for B. R. Gen. Hosp. & Argonaut Southwest Ins. Co.
Donald S. Zuber, Baton Rouge, for defendant-appellee Dr. Alvin Stander, Bone & Joint Clinic & St. Paul Fire & Marine Ins. Co.
Before LOTTINGER, BLANCHE and de la HOUSSAYE, JJ.
BLANCHE, Judge.
Plaintiffs, Thomas Griffin Haynes and his wife, Mary Gordon Haynes, instituted this medical malpractice suit against defendants, Dr. Alvin Stander, the partnership of which he is a partner, the Bone & Joint Clinic, their insurer, St. Paul Fire and Marine Insurance Company, Baton Rouge General Hospital, the hospital where Mrs. Haynes underwent surgery, and the hospital's insurer, Argonaut-Southwest Insurance Company. Following a *151 trial by jury, the jury returned a verdict in favor of the defendants, and judgment was accordingly rendered dismissing plaintiffs' suit. From this adverse judgment plaintiffs perfected this devolutive appeal against only the defendant-physician, the Bone and Joint Clinic and their insurer, St. Paul Fire and Marine Insurance Company. We affirm.
The evidence shows that Dr. Stander initially treated Mrs. Haynes in July of 1966 for a fractured right hip, which treatment included surgery. Additional surgery was performed in January of 1967 to facilitate healing of the fracture. In August of 1970, however, diagnostic studies indicated Mrs. Haynes was suffering from an avascular necrosis of the femoral head. Mrs. Haynes was next seen by Dr. Stander's partner on July 23, 1971, and on several occasions the following August by Dr. Stander, at which time additional surgery was discussed.
Because of increased pain, plaintiff presented herself to Dr. Stander for surgery. She was hospitalized at Baton Rouge General Hospital and the surgical procedure was performed on December 6, 1971, by Dr. Stander.
Because this was subsequent surgery, Mrs. Haynes had been administered antibiotics pre-operatively and she was continued post-operatively on a broad spectrum antibiotic known as Keflin, which antibiotic is administered intravenously.
Since a routine urine report and subsequent culture revealed the presence of a urinary tract infection or kidney infection, which urine specimen was taken on December 19, 1971, and cultured on December 21, 1971, Dr. Stander switched plaintiff's antibiotic medicine from Keflin to Keflex, which is administered orally. Both drugs are forms of Cephalothin, and the pathologist's drug sensitivity tests indicated the organism causing the urinary tract or kidney infection was sensitive, inter alia, to Cephalothin.
Dr. Stander noted slight drainage from the surgical incision on December 23, 1971, and a specimen of the drainage indicated the offending organism to be Enterobacter. The drug sensitivity test prepared by the pathologist indicated that this organism was, like the Escherichia coli, which was causing the urinary infection, sensitive, inter alia, to Cephalothin. Because plaintiff was already responding satisfactorily in Dr. Stander's opinion to the oral medication Keflex, a form of Cephalothin, Dr. Stander testified he saw no reason to change the antibiotic.
Plaintiff's wound-site infection apparently cleared, as did the urinary tract or kidney infection, and plaintiff was discharged from the hospital on December 31, 1971.
Her first office visit with Dr. Stander was on January 18, 1972, which was uneventful. Plaintiff was next seen by Dr. Stephen Wilson, at the Bone & Joine Clinic, in Dr. Stander's absence on January 25, 1972, at which time Dr. Wilson noted drainage from the surgical incision which he diagnosed as probably being a superficial wound-site infection. Dr. Wilson likewise prescribed Keflex. Dr. Stander next saw plaintiff three days later on January 28, 1972, at which time, according to Dr. Stander, there was no drainage evidenced from the surgical incision.
Plaintiff was subsequently seen on January 31, February 2, February 8, February 25, March 10, March 29, and April 21, 1972, all of which visits were, according to Dr. Stander, uneventful. Plaintiff was seen on June 14, 1972, at which time x-rays were taken. Plaintiff was next seen on June 26, 1972, at which time the hip joint was aspirated and cortisone injected into the joint, cortisone being, according to Dr. Stander, an anti-inflammatory agent utilized to reduce pain and discomfort. Plaintiff was next seen on June 30, 1972, July 26, 1972, and last seen by Dr. Stander on August 9, 1972.
Plaintiffs contend that Dr. Stander failed to exercise the required degree of *152 care, their principal argument being that Dr. Stander prescribed Keflex even though the literature disseminated by the manufacturer of this brand name drug indicates that it is not effective against "most strains of Enterobacter." (Emphasis supplied) An examination of these documents introduced in evidence reflects that they do not indicate that the drug Keflex is not active against all strains of Enterobacter.
Dr. Stander and the other physicians who testified on his behalf all indicated that they rely on the pathologist's drug sensitivity tests more so than on the literature disseminated by the drug companies. In this regard Dr. Stander testified as follows:
"Q Now, Doctor, we have had a lot of talk here about this drug flyer. As a practicing physician what is your view of these drug flyers?
"A I read them and certainly take note of the indications and the contradictions particularly. However, I depend much more on the laboratory, the hospital laboratory examinations.
"Q Why is this, Doctor, rather than the drug flyer?
"A Well, I think it is a little more specific than the drug flyers.
"Q In other words, the hospital lab is testing the bug you are dealing with?
"A They are testing that particular bug, that particular strain of species, and if they can demonstrate that the antibiotic is effective against that particular strain I think that is very pertinent information and justification for utilizing that particular drug.
"Q And the next step, how was the patient doing with that particular drug?
"A The patient was responding."
(Record, pp. 257, 258)
"Q I see. Now, would you read further and see if it has any statements relative to Enterobacter species?
"A `Most strains of enterococci and a few strains of staphylococci are resistant... not active against most strains of Enterobacter.... It has not activity against Pseudomonas or Herellea species.' Now, I will repeat, it is not active against most strains of Enterobacter, however our laboratory tests showed that it was active, so rather than go by this insert in the thing, we go by our laboratory tests."
(Record, pp. 96, 97)
To the same effect is the testimony of Dr. Herbert K. Plauche, another Baton Rouge orthopedist:
"Q Doctor, there has been introduced into evidence a number of these drug flyers and a number of references to the PDR [Physicians Desk Reference] and all kinds of things here. I will show you a couple of them, especially a drug brochure on Keflex. In this drug brochure there has been much discussion throughout this case of the fact that the following statement is contained in the particular drug brochure: `It is not active against most strains of Enterobacter species, Pr. morganii and Pr. vulgaris.' That is a full sentence contained in there. Now, here we have a case where, one, we had a sensitivity report saying Cephalothin, the drug is sensitive to Cephalothin, and, two, we have a good patient response to Cephalexin. Would a doctor breach the standard of care in the community by not practicing by what this drug brochure says?
"A Well, I think it gets back to the basic treatment of the patient with an infection. One has to treat the patient more than the laboratory. I think that the laboratory results here *153 indicateare corroboration that the drug was active against this particular organism. It says here specifically that the drug is not active against most strains of Enterobacter. Apparently in this particular case the drug was active against that particular strain and I think this is corroborated by the fact that the patient responded to treatment with that drug.
"Q The really crucial test, as I understand it, in the practive of medicine is how the patient responds to the drug, not thenot what the literature says?
"A That's correct."
(Record, pp. 304, 305)
The testimony of Dr. Allen Jackson, another Baton Rouge orthopedist who testified on behalf of defendants, was to the same effect:
"Q Are you aware, Dr. Jackson, of the fact that the PDR discussion of Keflex makes the statement that most strains of Enterobacter are resistant to Keflex, or, it is not active, I think was the exact statement, against most strains of Enterobacter species?
"A No, I am not. I had heard it mentioned within the last twenty-four hours, but I wasn't aware of it prior to that.
"Q Would this give any indication of changing the medication in view of the sensitivity report?
"A Well, as I look at this culture report dated 12/27/71, I assume that's the one we are talking about?
"Q. Yes.
"A Enterobacter, there is not a single antibiotic that it is resistant to. It is sensitive to every antibiotic that is listed, so the assumption then in the doctor's mind then would be that it is a low-grade pathogen, that it is responding and I certainly wouldn't change anything. Why would you change it? It shows no resistance whatsoever.
"Q Well, what about these drug flyers?
"A Well, I think anybody that has read anything or knows anything about the FDA and the Government in recent years will know that the drug companies are so hamstrung by restrictions and problems with the FDAsome of our most effective antibiotics have been completely withdrawn from the market because the Government will not allow combinations of antibiotics any more. We used to use an antibiotic like a Tetracycline in combination with an antibiotic that would prevent growth in yeast or other bacteria, but we can't use those any more, so frequently the drug flyers have so many restrictions and requirements and limitations in the use that it almost makes you wonder how you can use any antibiotic or any drug.
"Q So actually the choice of drug then becomes the clinical judgment of the treating physician?
"A You certainly don't practice your medicine off of the drug flyer. If you did you wouldn't even use any of them because they all say they can cause death, they can cause skin reactions, they can cause blood problems, if you would look at the flyer on aspirin alone it makes you wonder if you will ever take an aspirin."

(Record, pp. 378, 379)
Dr. Albert L. McQuown, a Baton Rouge pathologist, testified that there was no essential difference with respect to the efficacy of Keflin and Keflex, that in his opinion it was proper medical treatment to *154 keep this patient on the same antibiotic, and that the drug literature was not nearly as significant or specific as the pathological sensitivity tests:
"Q And so from your point of view and your point of view as a doctor and a doctor specializing in pathology, there is no essential difference between Keflin and Keflex for the purpose of susceptibility of organisms?
"A No, except one is injectible and one is oral, but the activity against the bacteria is basically the same and then in turn we want toyou would use the one that you thought was best and that you were used to using."
(Record, pp. 335, 336)
"Q Isn't it true that it really boils down to the clinical judgment of the physician treating the patient as to the method by which the patient is treated, which antibiotics to use and which drug is his choice to treat his patient, it is the judgment of the physician?
"A Practically every one, every group of physicians, be they urologists or orthopedic surgeons or general surgeons or other type of surgery specialists, internists, pediatricians on babies, they are associated with certain types of infections that are found following certain mechanisms at certain times of the year and most of the individuals coming in, as I mentioned before, with the findings and symptoms of infection, using clinical judgment the physician will put the patient on an antibiotic and the patientsometimes they will follow up, particularly in a more complicated case, by asking for a culture and sensitivity, but if the patientif their judgment is right and they have given an antibiotic and the patient is notthe fever goes down, the patient is getting well, the swelling is subsiding, the purulent exudate or pus or the sore throat is disappearing, the physician says, `I have the right drug for this organism which I will know tomorrow and I am happy with it,' and even if the pathologist says that these are better sensitivities if they have already been on the medication for four or five days, why switch over to another medication if the patient is getting well?
"Q Because that is the ultimate goal, is it not, to get the patient well?
"A Primarily for that reason and, also, it is going to double the expense of the patient and then you, also, if it is in another generic group of medication you are going to have to build up that concentration in the body to take over the fight that the one that you have already given has already gained the concentration for, so it would be somewhat of a folly to change boats in the middle of the stream if the boat you have is floating well and you are getting down the stream."
(Record, pp. 347-349)
"Q Will you examine this, please, sir, and see if this drug company has put out any information relative to how this drug Keflex may operate with Enterobacter?
"A (Witness examined document) Do you want me to read it?
"Q No, what does it say relative to Enterobacter?
"A Well, the drug release information here states that this drug is not active against many strains of the various types of your Enterobacteriaceae group.
*155 "Q Does it say `many' or `most'?
"A It says it is not active against most strains of Enterobacter, but if you have got an Enterobacter and you have already started the patient on Keflex and the patient's temperature is going down and her white count is not elevated and the thing is draining and is drying up, then it is obvious that you are dealing with an organism that is sensitive to it."
(Record, p. 356)
Plaintiffs' own expert, Dr. Ronald J. Seiberling, recognized by the court as an expert in microbiology specializing in infections and immunology, admitted that probably this particular organism causing the wound-site infection was sensitive to the drug Keflex:
"Q Now, Doctor, assuming that the Enterobacter infection was sensitive to the drug Cephalothin, would this definitely mean that the Enterobacter infection would be sensitive to the drug Keflex?
"A I can't make a positive statement on that. It is probably, yes."

(Record, pp. 221, 222)
Our review of the record fails to demonstrate in the face of the foregoing medical evidence that Dr. Stander deviated from the standard of care due this patient by prescribing the antibiotic Keflex and continuing to use the same, notwithstanding the admonition in the drug company literature that Keflex had not been demonstrated to be active against most species of Enterobacter. The jury was certainly justified in finding no negligence or breach of duty on the part of Dr. Stander in this regard.
Plaintiffs further contend that Dr. Stander was negligent, and the jury should have so found, in failing to detect the latent deep-seated infection over the many months following her discharge from the hospital, and in this connection contend that Dr. Stander failed to exercise the required degree of care owed this patient in not ordering sufficient x-rays and additional blood work, in injecting cortisone into the hip area and in not monitoring the patient's temperature. A review of the record demonstrates that Dr. Stander did, in fact, order x-rays for the patient on January 18, February 25, April 21 and June 14, 1972, but admittedly did not order any x-rays in July or during the first nine days of August.
Dr. Stander's explanation in response to these charges was that in his opinion he saw no evidence of chronic latent infection, thought the patient's hip pain was attributable to difficulty with the prosthesis rather than infection, and did not want to subject the patient to too much x-ray:
"Q One or two questions, Dr. Stander. What are the considerations about taking X-rays as a practical matter? How do you go about determining this?
"A Well, you take them as often as necessary, but not any more than is necessary. The diagnostic X-rays are not completely innocuous, but repeated X-rays arethe patient should be protected against too much X-ray.
"Q Why is this?
"A The effect on the bone marrow and on the blood stream, the blood picture.
"Q In your professional opinion and your opinion as a doctor, in the times that you saw this lady, was she giving you these symptoms whichat the time, not looking at it hindsight, that gave indication that she had a chronic latent infection?
"A No, I did not find evidence of that.

*156 "Q What did you think her complaints of pain were referrable to in the hip?
"A I thought the probability was difficulty with the prosthesis."
(Record, p. 282)
This evidence with respect to the possible abusive use of x-rays was corroborated by the other physicians who testified on behalf of Dr. Stander.
With regard to the alleged negligence on the part of Dr. Stander in not ordering additional blood work, the evidence reveals that such blood tests would in all probability have been of no diagnostic value to Dr. Stander. Mrs. Haynes underwent blood work ordered by Dr. Samuel E. Field, who performed a breast biopsy on Mrs. Haynes on May 15, 1972. Prior thereto Dr. Field examined plaintiff and noted her surgical incisions were well healed, and a blood test ordered the day before the biopsy indicated her white blood count was within normal limits. Dr. Field was of the opinion at that time that Mrs. Haynes was free of infection. Dr. Adolphus W. Dunn, who testified solely as a fact witness relative to his treatment, including surgery, performed on this patient at Ochsner Foundation Hospital in New Orleans, indicated that the patient's blood count had been consistently rather normal notwithstanding the presence of the deep-seated latent infection in the hip region. Indeed, the plaintiff's blood count was within normal limits prior to surgery performed by Dr. Dunn on her in September of 1972.
The physicians who testified on behalf of defendant, Dr. Stander, all confirmed that in their opinion Dr. Stander in no way deviated from the standard of care or acceptable medical treatment owed to a patient such as the plaintiff.
As a reviewing court, we are admonished by the Louisiana Supreme Court to give great weight to the factual findings of the trier of fact, be it judge or jury, especially where such findings are based upon an evaluation by the trier of fact of the credibility of the witnesses:
"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review of the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility, and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." (Canter v. Koehring Company, 283 So.2d 716, 724 [Lousiana Supreme Court, 1973])
We recently recognized the applicability of this touchstone of appellate review in affirming a defendant jury verdict in a medical malpractice case, see Busby v. St. Paul Fire and Marine Insurance Company, 290 So.2d 701 (La.App. 1st Cir. 1974), writ refused, 294 So.2d 546 (La.1974).
Plaintiffs further contend that the trial judge erred in not giving requested special jury instructions, and that the trial judge's general charges to the jury were erroneous as a matter of law. Both of these specifications are without merit.
Inasmuch as plaintiffs failed to object to the trial judge's general charge to the jury prior to the jury's retirement and only objected to the failure of the trial judge to give the requested special jury instructions, plaintiffs are precluded from now urging, after an adverse verdict, alleged error in the trial judge's general *157 charge, Louisiana Code of Civil Procedure, Article 1793; Alexander v. Alton Ochsner Medical Foundation, 276 So.2d 794 (La. App. 4th Cir. 1973); Jackson v. West Jefferson General Hospital, 245 So.2d 724 (La.App. 4th Cir. 1971).
With regard to the four requested special charges which the trial judge declined to give, the first of these requested charges reads as follows:
"I charge you that it is understandable if no medical testimony is offered in that this is true in most malpractice suits because of the reluctance of the medical profession to acknowledge errors of their fellows.
"Authorities:
"Slack v. Fleet, 242 So.2d 650 ([La. App.] 1970)."
(Record, p. 61)
This is not a proper statement of the law, and the giving of this instruction was properly refused by the trial judge. In Slack v. Fleet, 242 So.2d 650, 652 (La.App. 1st Cir. 1970), the statement quoted above was followed by the following statement made by the trial judge:
"* * * Nonetheless, the absence of any affirmative proof on this point must be noted because it contrasts with the supporting testimony furnished by the defendant in affirmation of the treatment rendered by him in the case. * * *"
(Id. at 652)
Plaintiffs' requested special charge No. 2 read as follows:
"I charge you that a physician is required to administer or prescribe a drug in a safe manner and dosage usually that which is recommended by the manufacturer of the drug.
"Authorities:
"R.C.C. 2315
"Chrestman v. Kendall, 247 Ark. 802, 448 S.W.2d 22 (1969);
"Holl v. Talcott, 171 So.2d 412 (Fla. App., 1965);
"Talcott v. Holl, 224 So.2d 420 (Fla. App., 1969);
"Incollingo v. Ewing, 444 Pa. 263, 282 A.2d 206 (1971), 444 Pa. 299, 282 A.2d 225 (1971);
"21 U.S.C. Sec. 357"
(Record, p. 62)
Plaintiffs' special charge No. 4 reads as follows:
"I charge you that the administration of the wrong drug to a patient is negligence as a matter of law.
"Authorities:
"R.C.C. 2315
"Schulz v. Feigal, 273 Minn. 470, 142 N.W.2d 84"
(Record, p. 64)
Both of these statements constitute pronouncements of law not precisely recognized in Louisiana, were properly refused as giving rise to potential confusion, and were more appropriately stated in the trial judge's general charge to the jury. The judge has a duty to charge the jury as to the applicable law and the correlative right to require that the jury get only the correct law; the trial judge does not commit error in refusing to give a requested special charge where such charge is in effect included in his general charge, Morales v. Toye Brothers Yellow Cab Company, 246 So.2d 52 (La.App. 4th Cir. 1971), writ refused, 258 La. 772, 247 So.2d 867; Little v. Hughes, 136 So.2d 448 (La.App. 1st Cir. 1961).
Plaintiffs' requested special charge No. 3 reads as follows:
"I charge you that a member of a medical profession may not avoid liability on the ground that the physician followed *158 a custom and procedure in the community when such practice is shown to constitute negligence in that it fails to guard against injury to the patient from a reasonably foreseeable contingency."
"Authorities:
"Favalora v. Aetna Casualty and Surety Company [La.App.], 144 So.2d 544."
(Record, p. 63)
This requested special charge was adequately covered by the trial judge's general charge to the jury, and the failure to amplify by including the specific verbiage requested by counsel for plaintiffs does not constitute reversible error.
For the foregoing reasons, the judgment appealed from is affirmed, with all costs of this appeal assessed to plaintiffs-appellants.
Affirmed.