458 So.2d 167 (1984)
Barbara BOURGEOIS
v.
BILL WATSON'S INVESTMENTS, INC.
No. 83-CA-786.
Court of Appeal of Louisiana, Fifth Circuit.
October 11, 1984.
*169 Lobman & Carnahan, David V. Batt, Metairie, for plaintiff-appellee.
Christovich & Kearney, Terry Christovich Gay, New Orleans, for defendant-appellant.
Before GRISBAUM, GAUDIN and CHEHARDY, JJ.
GRISBAUM, Judge.
This appeal arises as a result of an automobile accident. The plaintiff filed an action against the car dealer alleging negligence on the part of the dealer in failing to repair a defect in the accelerator system of her car. From a jury verdict in favor of the plaintiff for personal injuries, the defendant car dealer suspensively appeals. We affirm.
Five issues are presented for our review.
(1) Whether the trial court was clearly wrong in finding the car dealer was negligent and such negligence was the proximate cause of the accident.
*170 (2) Whether the trial court erred in refusing to allow the jury to see Bill Watson's Ford's service records during deliberations.
(3) Whether a juror's misconduct influenced the other jurors so as to deprive the defendant of a meaningful jury trial.
(4) Whether the trial court erred in refusing to give a special charge to the jury as requested by the defendant.
(5) Whether the trial court abused its discretion in awarding $25,000 in damages for personal injury to the plaintiff.
On October 20, 1978, the plaintiff, Barbara Bourgeois, purchased her 1979 Ford Mustang from Bill Watson's Ford, Inc. On January 5, 1980, she was injured when her car hit a curb and flipped upside down. She was alone at the time of the accident.
In describing the accident, she testified as follows: While driving at approximately 20 to 30 miles per hour on West Esplanade Avenue in Metairie, her car began to accelerate spontaneously. She placed her foot underneath the accelerator pedal and pulled the pedal towards her; however, the car continued out of control "as if it were on cruise control." Thereafter, attempting to brake the car, she placed one foot on the brake and then exerted pressure with both feet, to no avail. She testified that as a result of the braking action, her car swerved and hit a curb on West Esplanade, spun around, jumped the curb, and flipped upside down on the neutral ground.
Immediately after the accident, a passerby, Ms. Estelle Stinner, a licensed practical nurse, attempted to assist Ms. Bourgeois. Ms. Stinner testified the plaintiff was in a state of shock and that she complained of head pain and low back pain. Ms. Stinner recounted Ms. Bourgeois' story as told at the time of the accident: "... the car kept going faster and faster. She (Ms. Bourgeois) said that she tried to stop the car, and nothing she would do would stop the car. The next thing she knew she was up on the neutral ground and the car was overturned."
The jury awarded $25,000 against Bill Watson's Ford, Inc. in favor of the plaintiff, and thereafter, Bill Watson's Ford, Inc. filed a motion for a new trial and, in the alternative, for a judgment notwithstanding the verdict, both of which motions were denied.
ISSUE ONE
In addressing the issue of Bill Watson's Ford's negligence, the plaintiff alleges the dealer had three opportunities to repair the defective accelerator system in her car, once at the time of the sale of the car, at which time Bill Watson's Ford was obligated to perform a pre-delivery check of the car in accordance with its contractual obligation imposed by Ford Motor Company. Additionally, Ms. Bourgeois alleges she complained to her dealer on two separate occasions of a sticking accelerator. The jury found the plaintiff's vehicle contained a defect and the failure of Bill Watson's Ford to adequately repair the defect was the proximate cause of the accident.
Two witnesses testified regarding whether a defect in the accelerator system of the plaintiff's car existed at the time of the sale. The plaintiff's witness, Fred Liebkemann, who was qualified as an expert in mechanical engineering, testified there was an accelerator malfunction. He examined the vehicle shortly after the accident and discovered two distinct problems with the accelerator precipatating the accident. First, there was a crack in the accelerator cable covering, and because the cable is directly linked to the accelerator, any tendency for this cable to "hang-up" would cause the accelerator pedal to be depressed resulting in acceleration of the vehicle. The relationship of the accelerator cable to the accelerator pedal was described in detail by Mr. Liebkemann as follows:
... there is a cable that goes from the accelerator pedal linkage to the accelerator arm on the carburetor and this is known as the throttle cable and it consists of an interwire or moving member inside of a sheet with a hole in it and the outside of this sheet is coated with rubber for protection. At the carburetor, *171 this flexible cable enters a ferrule, which is a round hole and the cable had been pulled down rather tightly alongside of the back of the engine, such that the flexible part of the cable met the ridge guider at a 40°, 45° angle and where that occurred, the outer protective cover of the cable assembly was cracked open and this 40°, 45° sharp bend creates a restriction against movement of the inner cable. Over time, that bend will tend to get worse. Also over time, as a result of the outer covering being cracked, moisture can enter and corrosion can build up in there so the restrictive effect of it can get worse all the time.
Mr. Liebkemann further stated the cracking in the covering of the accelerator cable was caused by improper installation, and more specifically, by the extreme angle at which the cable entered a ferrule in the engine. Photographs which he took of the cracking of the accelerator cables were introduced into evidence. Mr. Liebkemann described the cause and effect relationship between the restriction caused by the cracking of the accelerator covering and the hanging up of the accelerator pedal as follows:
... the problem is a restriction of the action of the cable. In other words, you have the inside of that cable, you have the member that slides back and forth to operate the carburetor or to speed up or slow down the vehicle. Of course, when the operator presses down on the accelerator, the operator's power from the operator's foot speeding it up, when the operator takes the foot off the accelerator, there is nothing to stop it or slow it down. As this condition progresses your, angle gets worse. You start to get restriction in there. The over outing (sic) covering allows dirt and corrosion to build up in there. It restricts movement as it gets greater and greater. You can expect that when it finally doeswell, if it progresses sooner or later, it will freeze up and stick. You can expect that problem when the operator depresses the pedal because the operator can exert more force with his foot than the spring does pulling back, but what you will get is the condition becomes progressively worse.
The second problem, he stated, involved the configuration and installation of the carpet around the accelerator pedal. The carpet was improperly installed and secured causing a bunching up and overlapping around the accelerator and creating a restriction in movement of the accelerator pedal. A photograph of the alleged defect was introduced into evidence.
Defendant's expert witness, Patrick Valent, a design analysis engineer, who has worked 33 years with Ford automobiles, stated the angle of the cable, as demonstrated in the photograph taken by Mr. Liebkemann, is the angle which was intended by the Ford Company. He stated that by twisting the cable around to 180 degrees, the cable still moves within the tube without any inhibition. To Mr. Liebkemann's testimony with reference to a crack in the plastic coating, Mr. Valent responded:
What Mr. Liebkemann referred to as a crack, he specifically mentioned that it was a crack in the plastic coating or the rubber coating on the outside of the cable, it's not a crack. It is a discontinuity in the coating that is done on purpose. The reason it's manufactured that way is that in its normal operation this particular bracket here is mounted to the engine. It received a good bit of heat. If we were to put that molded section inside of this ferrule that heat would then attack this molded section and loosen the connection so you deliberately do not seal that all the way. Again the function of this cover is to keep water from leaking inside here, inside the passenger compartment. Water does not leak into this cable. This voided area we are looking at here is not a water leak. Water cannot get to that cable.
The cable as shown in the picture shows a cable exactly as this new one which has never been used at all, the insulation is normal and this cable is normal. *172 Additionally, Mr. Valent stated the carpet in 1979 Mustangs surrounding the accelerator is not intended to be attached to the floor but rather should move freely so as to prevent impediment to the pedal movement. This looseness, according to Mr. Valent, could not have impeded the accelerator pedal from coming back to idle.
We note, Mr. Valent admitted upon cross-examination that a bend in the linkage of the accelerator cable can cause the accelerator to hang-up or stick. In addition, Mr. Valent admitted outside suppliers designed systems for Ford cars so that he could not be sure of the design specifications of the accelerator system in the plaintiff's car.
The defendant complains that through no fault of its own, its expert was not given the opportunity to inspect the vehicle in question, and therefore, the defendant argues, the plaintiff's failure to produce the car as evidence leads to the presumption the production of the car would have been detrimental to the plaintiff's case. We note this presumption is applicable only where the failure to produce the evidence is not explained. Babineaux v. Black, 396 So.2d 584 (La.App. 3d Cir.1981). In Babineaux, the court stated:
It is true that under a long line of jurisprudence, the failure of a litigant to produce evidence within his reach raises the presumption that the evidence would have been detrimental to his case ... however, this presumption is not applicable where the failure to produce the evidence is explained. Babineaux v. Black, 396 So.2d 584, 586.
Since Ms. Bourgeois had an explanation, i.e., it was required by her insurance contract with State Farm that she sell the vehicle to State Farm in order to recover property damages, we find the Babineaux presumption is inapplicable.
Ultimately, the credibility of witnesses lies with the trier of fact and is particularly a matter to which the trier of fact has much discretion. Payne v. New Orleans Public Service, Inc., 374 So.2d 189 (La.App. 4th Cir.1979). As the trier of fact, the jury is to exercise its discretion in determining whether or not to believe and accept any part or parts of a witness' testimony and reject any part or parts thereof. Apparently, the jury found the plaintiff's witness more convincing than the defendant's witness, and we find no abuse of discretion by the jury particularly in light of the consistency in the testimony of the plaintiff's witness and the inconsistency in the testimony of the defendant's witness.
The expert testimony as well as photographs taken by Mr. Liebkemann adequately support the finding by the jury that there was a defect in the plaintiff's accelerator system at the time of the sale. The defendant's expert witness admitted that a bend in the linkage of the accelerator cable can cause the accelerator to hang-up or stick and thereby corroborated the testimony of the plaintiff's expert engineer by recognizing a condition in the vehicle which, if it had existed, could have precipitated the accelerator sticking or hang-up. Also significant is the admission by the defendant's witness that outside suppliers designed systems for Ford cars which admission leads to the conclusion that this witness could not be sure of the design specifications of the accelerator system in the plaintiff's car.
The jury found the defendant had been placed on notice of the defect in the plaintiff's accelerator system and the failure of the defendant to repair the defect was the proximate cause of the plaintiff's accident. We cannot say the trial court was incorrect in concluding the defendant's breach of duty was so severe as to be the proximate cause of the accident.
In Hunt v. Ford Motor Company, 341 So.2d 614 (La.App. 2d Cir.1977), the court recognized the ordinary new car warranty system virtually forces the purchaser to look to the dealer for the discovery and repair of defects, and thus the dealer's repairman is to be held to a high duty to make all reasonable efforts to locate and correct the difficulty. Because of Bill Watson's Ford's contractual obligation to Ford Motor Company to conduct a checklist inspection *173 of every newly delivered vehicle, the duty of reasonable care, inspection, and repair owed by Bill Watson's Ford to the plaintiff is as articulated in the Hunt decision.
It is true, as the defendant points out, the dealer does not have an obligation to disassemble a car and search out latent defects. Spillers v. Montgomery Ward, 294 So.2d 803, 807 (La.1974). Nevertheless, the automobile dealer repairman when presented with complaints of difficulty with a vital component of an automobile is, in effect, given notice of the existence of a defect and, although the precise nature of the defect may not be actually known, the dealer then may be presumed to know the vice of the thing he has sold. To negative the presumption, it is incumbent on the dealer to show he made all reasonable efforts to discover the precise nature of the defect and that the defect could not be discovered in spite of such effort. Hunt v. Ford Motor Company, 341 So.2d 614. The defendant failed to present evidence to demonstrate it made all reasonable efforts to discover the nature of the defect but instead alleged it had never been placed on notice of any defect in the plaintiff's accelerator system.
Given the totality of the testimony at trial, however, it cannot be said the jury was clearly wrong in concluding the defendant had knowledge of the existence of the defect whether through its own discovery in a pre-delivery check of the car or by complaints made by Ms. Bourgeois on two occasions. Therefore, we will not disturb this finding of fact. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Ms. Bourgeois testified she had presented her car to Bill Watson's Ford at least ten times for servicing a variety of problems and twice for a sticking accelerator. Her husband corroborated her statement. The defendant produced a record of eight instances of service to the plaintiff's car, but produced no record of complaints regarding the accelerator system. Several of Bill Watson's Ford's employees testified regarding reports made to them as service writers for repairs made to parts of Ms. Bourgeois' car other than the accelerator system. None of them, however, could testify that the service records which were in the exclusive control of Bill Watson's Ford were complete.
The defendant's witnesses, Eugene Pellegrine, who is now a service manager of Bill Watson's Ford and was service writer before November of 1982, and Ronald Lamarque, who was employed by Bill Watson's Ford in 1979 as vice president and general manager, testified the standard procedure by Bill Watson's Ford when selling a car is to make a very thorough pre-delivery check of the car. Record of the pre-delivery service check of Ms. Bourgeois' car, however, was not available for trial probably because it was destroyed, as a matter of course, one year after the sale of the car.
We find the jury did not abuse its much discretion in relying upon the testimony of Ms. Bourgeois and her husband. Credibility determinations are particularly within the discretion of the trial court. Payne v. New Orleans Public Service, Inc., 374 So.2d 189, 191 (La.App. 4th Cir. 1979). The defendant relies heavily upon what it finds to be inconsistencies in Ms. Bourgeois' testimony and on the fact that Ms. Bourgeois failed to produce receipts for repair work done on her accelerator. We find, however, any inconsistencies in Ms. Bourgeois' testimony are minor and immaterial. Moreover, the defendant's attorney impeached Ms. Bourgeois at trial and thus, the jury, in assessing the plaintiff's credibility had the opportunity to consider inconsistencies in her testimony. The plaintiff did not have receipts of service rendered by Bill Watson's Ford because, as Lamarque implicitly stated at trial, the customer must first request the receipt before it is given to him.
ISSUE TWO
The defendant alleges it was prejudiced by the failure of the trial court to allow the jury during deliberation to see the service records which were admitted *174 into evidence. We look to Code of Civil Procedure article 1794, the controlling statutory provision, which provides:
In reaching a verdict the jurors must rely upon their memories, and, when they retire from the jury room to deliberate, they shall not be allowed access to any written evidence or any notes of the testimony of any witness, but they may take with them any object or document received in evidence which requires a physical examination to arrive at a just conclusion.
We are guided by our jurisprudence in Briscoe v. Stewart, 423 So.2d 1198, 1201 (La.App. 4th Cir.1982), wherein the court stated the jury is not allowed to view upon deliberation any document whatsoever just because it has been admitted into evidence. To the contrary, article 1794 provides the submission of written evidence to the jury upon deliberation shall be the exception rather than the rule and shall be allowed only when physical inspection is necessary to arrive at a just verdict. As a precondition to inspection by the jury, a writing must be, at the very least, relevant to some material issue in dispute; beyond that, it must be more probative than prejudicial. Briscoe, supra.
The policy underlying the prohibition of the article is to prevent undue weight being given written documents as opposed to oral testimony. Salemi v. St. Paul Fire & Marine Insurance Company, 339 So.2d 1264 (La.App. 1st Cir.1976). In the instant case, as in Salemi, there were witnesses to testify with regard to the contents of the document, and in addition, the counsel for the defendant was free to submit the service records to the jury for their inspection during the trial; thus, it was not necessary in order to reach a just conclusion for the jury to see the records during deliberation, and article 1794 prohibits the same. Moreover, only the verbal content of the record was relevant to a determination of the outcome of the case, and there was no need for a physical inspection.
ISSUE THREE
In addressing the third issue, we note that early in the trial a complaint was made to the trial judge of a juror's misconduct. The juror was promptly removed from the jury and an alternate substituted. Nevertheless, the defendant argues his case has been prejudiced by the juror's misconduct. To the contrary, we find the defendant was not deprived of a meaningful jury trial by this misconduct.
Improper behavior by a juror has not been strictly defined by either statute or jurisprudence. Instead, improper behavior must be determined by the facts and circumstances of a particular case. Blandino v. Brown Erection Company, Inc., 341 So.2d 577, 580 (La.App. 2d Cir. 1977). It cannot be determined which party was actually prejudiced by the juror's remarks since his remarks are not on record. In fact, it was plaintiff's counsel, and not counsel for the defendant, who brought the juror's conduct to the attention of the trial court thereby initiating the juror's dismissal from the jury. In any event, the Blandino court held the presence on a jury of a highly opinionated person does not constitute improper behavior so as to preclude the achievement of impartial justice.
ISSUE FOUR
The defendant claims the trial court erred in refusing to give the following special jury charge which was requested by the defendant:
That a seller as distinguished from a manufacturer is not presumed to know the latent defects in a product he sells. (Emphasis added)
The court gave instead the following charge:
A retail automobile dealer ordinarily owes the duty of reasonable inspection of automobiles sold by it according to the standards in the industry, but it is not required to disassemble the automobile or make minute inspections for latent defects. (Emphasis added)
*175 We recognize the trial judge has a duty to charge the jury as to the applicable law and a correlative right to require that the jury consider only the correct law. Haynes v. Baton Rouge General Hospital, 298 So.2d 149, 157 (La.App. 1st Cir.1974). Our jurisprudence, however, indicates it is not error for a trial judge to refuse to give a requested special charge where such charge is included in his general charge. Haynes v. Baton Rouge General Hospital, supra; Morales v. Toye Brothers Yellow Cab Company, 246 So.2d 52 (La.App. 4th Cir.1971). It is necessary only to find the charge given by the court provided the correct principle of law for the jury's application thereto. Miller v. Fogleman Truck Lines, Inc., 398 So.2d 634 (La. App. 3d Cir.1981); Hanks v. Drs. Ranson, Swan and Burch, Ltd., 359 So.2d 1089 (La.App. 3d Cir.1978). The plaintiff argues that if the law does not require the seller to inspect for latent defects, then, it follows, he is not presumed to know of such defects, and that, therefore, the defendant's requested jury charge was cumulative and redundant. We find the jury instructions as a whole were clear with regard to the duty owed by the defendant and could not have mislead the jury to believe the presumption of knowledge applicable to Ford Motor Company was likewise applicable to the defendant. Therefore, omission of the requested charge did not deprive the defendant of a meaningful jury trial.
ISSUE FIVE
We now address the final issue of whether the trial court abused its discretion in awarding $25,000 to the plaintiff. We recognize we have a constitutional duty to review the law and facts and thereafter render a judgment on quantum based on the merits, determining whether the trial court has abused its "much discretion" the law accords it in awarding damages. Louisiana Constitution Article 5 § 10(B); Louisiana Civil Code article 1934(3); Reck v. Stevens, 373 So.2d 498, 499-501 (La.1979); Wilson v. Magee, 367 So.2d 314, 315 (La. 1979); Coco v. Winston Industries, 341 So.2d 332, 335 (La.1976). The record must clearly reveal that the trier of fact abused its discretion in making an award before the appeals court will disturb such an award. Coco, supra.
The initial inquiry in determining whether an award of damages is inadequate or excessive must always be directed to whether the trial court's award for particular injuries and their effects upon the injured person was a clear abuse of the trier of fact's "much discretion." It is only after an articulated analysis of the facts discloses an abuse of discretion that an award may, on appellate review, for articulated reasons, be considered either excessive or insufficient; only after such determination of abuse has been reached is a resort to prior awards appropriate for purposes other than determining what would be an appropriate award. Reck v. Stevens, 373 So.2d 498 (La.1979).
Ms. Bourgeois suffered multiple physiological injuries which include fractured coccyx, a bruised chest with resulting costochondritis, a possible concussion, and an increased lumbar lordotic curve in her back. She further suffered a cracked tooth which required dental treatment and may result in the loss of her tooth. She alleged she has suffered psychological injuries and testified she suffered from frequent nightmares and received psychiatric treatment for traumatic neurosis. The record also reflects she has received extensive medical and chiropractic care, including treatment for back and rib problems by an orthopedist; treatment for back problems by a chiropractor; treatment by a psychiatrist for emotional problems resulting from the accident; and treatment by a dentist for damage to her tooth and tooth pulp.
On the date of the accident, Ms. Bourgeois was treated at East Jefferson Hospital Emergency Room for possible concussion and pain in the lower back. As she continued with pain in her lower back and developed pain in her rib cage a few days after the accident, she eventually sought medical treatment from orthopedist Dr. Stuart Phillips, a Board-Certified orthopedic *176 surgeon, whose deposition was read to the jury by stipulation. Upon examination, Dr. Phillips found the plaintiff suffered from costochondritis, or tenderness and inflammation in the area where the ribs join the breastbone. He indicated the condition is caused by trauma and that this condition can take years to heal. Upon examination of x-rays, he found the plaintiff had an abnormality in the coccyx or tailbone area. It was probable this abnormality was due to trauma with dislocation and subsequent healing. The trauma-induced abnormality to the coccyx resulted in tailbone tenderness, a painful condition which is relieved by injections of steroids. The doctor indicated this deformity to the coccyx was a permanent condition and the pain from the deformity would last for several years. Additionally, the doctor found Ms. Bourgeois' "swayback", an increase lumbar lordotic curve in the spine, was caused by trauma and resulted in lumbar pain. The doctor treated the plaintiff on several occasions with injections of cortisone into the tailbone and chest area. He further recommended the plaintiff undergo heat treatment and undertake an exercise program.
Because relief from pain which the plaintiff received as a result of Dr. Phillips' treatment was transient, she consulted a chiropractor, Dr. Sherwood Beatty, who was qualified by the court as an expert in the field of chiropractic science. The plaintiff complained to the doctor of headaches, dizziness, low back aches, spinal soreness, and tailbone pain upon sitting. Dr. Beatty saw the plaintiff a total of 53 times and treated her with spinal manipulation, spinal adjustment, ultra-sound, and heat therapy, and adjusted her coccyx on two occasions. For the 53 visits, plaintiff was billed a total of $2528.
Dr. Robert Ancira, a Board-Certified psychiatrist, testified on behalf of the plaintiff. The plaintiff complained to the doctor of nightmares in which she envisioned a painful death resulting from the automobile accident; difficulty in sleeping; and fear of driving. The doctor diagnosed the plaintiff's condition as "traumatic neurosis." The plaintiff was treated by Dr. Ancira with the drugs Dolene and Valium.
In addition to the loss of past earnings for one week which Ms. Bourgeois missed due to her injury and the $2528 chiropractic bill, Ms. Bourgeois incurred the following debts:

 East Jefferson Hospital Emergency
 Room $253
 Dr. Phillips' Treatment 334
 Radiology Lab 42

Thus, she proved special damages in an amount exceeding $3000, and the remainder of the $25,000 damage award covers past, present and future pain and suffering.
We find the totality of the expert medical testimony amply supports the jury's finding for general damages and there has been no abuse of discretion. The defendant argues the expert, Dr. Gernon Brown, who was hired on behalf of the defendant, refuted the testimony of the plaintiff's treating physicians. However, the plaintiff's treating physician's opinion is entitled to more weight than the opinion of a doctor who examined the plaintiff for consultation for litigation purposes. See Schouest v. J. Ray McDermott, & Co., Inc., 411 So.2d 1042, 1044 (La.1982).
For the reasons assigned, the judgment appealed from is affirmed, all costs of this appeal to be paid by the appellant.
AFFIRMED.
GAUDIN, Judge, concurring in part and dissenting in part.
I concur in the foregoing opinion except for the award of $25,000.00. Petitioner sustained relatively minor physical injuries, including a chipped tooth, and returned to work one week after the accident.
The accident occurred on January 5, 1980, and plaintiff did not consult Dr. Robert Ancira, a psychiatrist, until July of 1980; and she did not see Dr. Stuart Phillips, an orthopedist who found a tenderness or inflamation in the area where the ribs meet the breast bone, until June 1, 1981, approximately a year and a half after the *177 accident. Petitioner's attorney recommended her to Drs. Ancira and Phillips.
The award was based primarily on the medical testimony of these doctors, and also on the testimony of a chiropractor who saw plaintiff 53 times, beginning on September 4, 1981. The chiropractor's bill was $2,528.00, by far the bulk of the special damages.
Accordingly, I respectfully dissent from the award.