JsPUFRESNE, Chief Judge.
This is an appeal by Alexander Lewis and Thaddeus Bazile, plaintiffs-appellants, from a judgment in their favor in this rear-end automobile collision case. This was a bench trial. In his reasons for judgment the trial judge noted that plaintiffs had shown that the accident had aggravated their pre-existing spinal disc problems, but also that they were exaggerating the severity and the duration of this aggravation. Based on these findings, each plaintiff was awarded only a portion of his medical bills, and $6,000 in general damages. Because we find neither legal nor manifest factual error in the actions of the trial judge, or any abuse of his discretion in fixing the amount of the damages, we affirm.
The basic facts of the accident are not disputed. On April 14, 1998, Lewis was driving his Ford Taurus with Bazile as his guest passenger. He stopped at a traffic light and was rear-ended by Kristin In-gles, who was driving a Nissan minivan. On these facts, the trial judge ascribed 100% of the fault to Ingles and that finding is not disputed here, so it need not be addressed further.
|aA major contested issue at trial was the speed of the Ingles van on impact, and the consequent potential for spinal disc injuries. The police report of the accident showed that none of the people involved claimed to be injured at the scene. It also *1035 showed an estimated speed on impact of 15 mph, and light damage to the front and rear of the respective vehicles. The report also showed that the Taurus did not move on impact and that there was no debris in the roadway. State trooper Roy Ingolia, the investigating officer, was shown pictures of the van taken after the accident which showed basically no damage at all. He testified that his notion of light damage was any scratch or smudge that might show up at points of impact and that if the photos were accurate than the speed on impact would have been less that 10 mph.
As to plaintiffs Taurus, photographs introduced at trial showed buckling on the left rear panel above the rear wheel. The cause of this buckling was also a major issue at trial because it was an indicia of the speed at impact. Ingolia noted that this buckling was not shown on his report, but testified that if it had in fact been caused by this accident then he would estimate the speed on impact to be above 25 mph.
It was established that Lewis had been involved in a 1997 accident in which there was damage to the left taillight, trunk, bumper, and left rear panel. Donald Scioneaux, an automobile body repairman, testified that he had repaired the damage to the Taurus caused by the 1997 accident. He said that when the car left the shop it was in pristine condition.
Allen Wilkins, the insurance adjuster involved with the accident at issue here, testified about his estimate of the damage and the speed needed to cause it. He assumed that the buckling of the left rear panel was the result of this accident, and that it was actually caused by the frame of the car being bent by Lthe rear impact. He said that to cause this damage the impact would have to have been at least 25 mph.
William Stretzinger, another insurance adjuster, was admitted as an expert in property damage and repair. This expert was of the opinion that the impact speed could not have been over 5 mph. He based this conclusion on several factors. First, there was no visible damage to the minivan, and had there been an impact sufficient to bend the Taurus frame and buckle the side panel this would not have been possible. Second, the air bag in the minivan would deploy on any impact of over 5 mph, and it did not deploy in this case. Third, the Ford Taurus is equipped with a safety fuel valve which shuts off the gasoline supply to the engine at impacts of above 5 mph, and this did not happen because Lewis was able to drive away from the accident. Fourth, the impact absorbers on the rear bumper of the Taurus would have ruptured at an impact of over 5 mph, and this did not occur. Finally, an impact sufficient to bend the frame and buckle the panel would have damaged the entire rear of the Taurus much more severely.
The medical evidence of plaintiffs’ alleged injuries was equally contradictory. Both plaintiffs indicated at the scene that they were uninjured, and only developed symptoms a day or two later. Both were originally treated by Dr. Isadore Brickman for what he diagnosed as cervical and lumbar strains. After about six months of conservative treatment he referred both men to Dr. Daniel Johnson, a radiologist, for diagnostic test. They both then saw Dr. Stuart Phillips, an orthopedic surgeon, for additional treatment. Finally, both were examined on request of the defendant insurance company by Dr. Daniel Aiken, also an orthopedic surgeon. The pertinent details of these treatments of each plaintiff are as follows.
| sLewis was about 57 years old at the time of this automobile accident. It was *1036 shown at trial that he had injured his back in 1987 in a work related accident and was diagnosed then with a ruptured disc at the L4-5 level and problems at the L5-S1 level as well. Although surgery had been recommended at that time, he declined to have this done. It appears that because of this problem he was found to be disabled. Nonetheless, he was doing heavy labor at Carrollton Wrecking Co., a demolition company, at the time of the present accident. The nature of this work was established both by video surveillance and the testimony of his supervisor on the job. He also testified that he continued to do this work after the accident, and there was no claim made here for wages lost because of the accident.
Two days after the accident, Lewis saw Dr. Isadore Brickman. This doctor’s records showed that he complained of neck and back pains. Conservative treatment for muscle sprain in these areas was begun, and continued for several months. Dr. Brickman said that he related these findings to the accident of April 14, 1998, but also admitted that Lewis did not inform him of his 1987 problems.
Because Lewis was still complaining of back pain after several months, Brickman ordered a CT scan which was done by Dr. Daniel Johnson, Jr., a radiologist. Dr. Johnson found the 1987 ruptured disc at the L4-5 level, and also noted bulging at the L5-S1 level. He had no opinion as to the cause of these findings, but thought that the L5-S1 problem was probably more recent.
Lewis was next seen on September 10, 1998, by Dr. Stuart Phillips, an orthopedic surgeon. Lewis was then complaining of back pain radiating into his leg, and noted that he had injured his back in 1987. The doctor found that Lewis had degenerative arthritis at L4-5 and L5-S1, which had been aggravated by trauma of the accident. Dr. Phillips again saw him in December with ^continuing complaints of back pain, and again in August of 1999 with the same symptoms. A year later, in August of 2000, Dr. Phillips felt that the aggravation of the arthritis was permanent. During his course of treatment Lewis never told this physician that he was still doing heavy labor at Carrollton Wrecking. Dr. Phillips admitted that if Lewis was in fact doing such labor then that exertion could have caused his symptoms in the absence of any trauma.
At defendant’s request, Lewis was seen by Dr. David Aiken, Jr., also an orthopedic surgeon, on June 7, 2000. This doctor reviewed all of the medical records of treatments going back to 1987, and took additional X-rays. He noted that Lewis told him that he had no back pain at the time, but that he had suffered from intermittent pain, perhaps occurring two or three times a week after prolonged sitting, since 1987. He said that he would get relief if he got up and walked around a bit. Lewis also said that he had been doing demolition work until about February of 2000, but had grown tired of it and quit. Dr. Aiken was of the opinion that Lewis suffered from advanced degenerative problems at L4-5 and L5-S1, but saw no ruptured disc. His opinion was that the back pains related by Lewis after the accident were more than likely caused by his heavy labor, rather than the accident. He noted that if Lewis had stopped the heavy work in February that would explain why he was symptom free by the time of the June 7 visit. He also stated that a collision at 5 mph could not have caused any worsening of the back, but that heavy labor certainly could.
Bazile was about 35 years old at the time of the accident. Coincidentally, he too had injured his neck and back in 1987. He likewise had continued doing heavy *1037 labor after the present accident as also shown in the surveillance video taken at Carrollton Wrecking and attested to by his supervisor, and he made no claim for lost wages.
IvBazile first saw Dr. Brickman two days after the accident with complaints of neck and back pain. He denied any prior injuries to these areas and said that he was only doing light work duty. He was treated conservatively and by July he had no positive findings in the neck and back. Then in late July and into September there were new signs of spasms in the neck and back regions, and Dr. Brickman ordered an MRI, again done by Dr. Johnson. At the time Dr. Brickman ordered the MRI his opinion was that because Ba-zile had no symptoms prior to the accident his post accident symptoms were caused by the accident.
Dr. Johnson testified that he perceived a problem at the C3^f and C4-5, but admitted that these were subtle findings that might be deemed normal by other doctors. He also found more definite evidence of a disc herniation at the L5-S1 level. As in the case of Lewis, he gave no opinion as to causation.
Dr. Phillips first saw Bazile on December 14, 1998. Bazile had complaints of neck and back pain with some numbness in his legs. He told that doctor that his regular job consisted of heavy lifting, but that he was not working at that time. This doctor’s initial diagnosis was cervical strain and a moderate herniation of the L5-S1 disc. He saw this patient in March, August and October of 1999, and in February of 2000, and on each occasion Bazile reported persistent back pain, but gradual improvement in the neck. Doctor Phillips’s final diagnosis was a traumatic lesion of the L5-S1 disc with continuing pain, but with the neck problem resolved. He ascribed these problems to the accident of April 14, 1998. He admitted, however, that if Bazile were doing heavy labor during the period of treatment then this could exacerbate his symptoms.
Bazile was seen by Dr. Aiken on June 1, 2000. He told this doctor that he had injured his back and neck in 1987 and had been treated by a Dr. | sWaguespack. He said that since that time his neck and back had hurt after strenuous activity. Bazile repeated- the “1987” date three times during this initial interview, belying any notion that he had misspoken. He also admitted to doing light work without much bending and lifting at Carrollton Wrecking. Dr. Aiken took X-rays and did an examination of Bazile and found his neck and back to be normal for a 37 year old with his work history. He saw generalized disc bulging at all of the disc spaces in his back and said that this condition was compatible with years of heavy labor which can be expected to cause “micro traumas” in the disc. He said that he could not discern the disc problems identified by Dr. Johnson. He found no evidence of any injury that might have been caused by the April 14, 1998, accident and said that a 5 mph accident would probably not have exacerbated any pre-existing back condition which Bazile might have had.
On the above evidence the trial judge found that both plaintiffs suffered short term aggravation of pre-existing conditions which should have resolved within six months of the accident. He therefore awarded each of them $6,000 in general damages. He also awarded Lewis $3,960 of his claimed medical bills of $4,569, and Bazile $3,560 of the $5,449 claimed, representing the bills incurred during the six months after the accident. He particularly noted in his reasons for judgment that although both had continued doing heavy labor after the accident, they both misrepresented to their various treating physi- *1038 dans that they were either not working or doing only light duty. He also said that he was “impressed with the testimony of Dr. Aiken.”
Because the findings concerning the severity and duration of plaintiffs’ injuries are factual, the standard of review in this court is whether, considering the entire record of the case, those findings are manifestly erroneous or clearly wrong, Stobart v. State through DODT, 617 So.2d 880 (La.1993). The Stobart | 9court went on to say that “where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly wrong.” (at 883)
As the above synopsis of the case shows, there was a very reasonable view of the evidence which would support findings that the accident was very minor and involved a collision speed of less than five mph. This was the hypothetical used by Dr. Aiken in forming his opinion that such a minor accident would probably not cause any injury to the plaintiffs.
Dr. Aiken’s expert’s opinion was further that he could find no conditions in either plaintiff that he could relate to the accident, nor could he find any symptoms in either that he would attribute to anything but their having done heavy labor for substantial portions of their lives. In addition, Dr. Phillips also admitted that if indeed both plaintiffs had continued doing heavy labor after the accident that any injuries the suffered in the accident would have continued to be exacerbated by the type of work they were doing. It is thus also reasonable for the finder of fact to have concluded that the injuries suffered in the accident lasted for no more than six months, and that their further complaints were related to the work they were doing. Therefore, an award of medical expenses for the six months after the accident was also a reasonable award.
Plaintiffs argue to the contrary that it was error for the trial judge to give more credence to Dr. Aiken than to their treating physicians because a treating physician’s testimony is entitled to more weight than that of a physician employed by the opposing party who sees plaintiff only once or twice and then for litigation purposes, citing Bourgeois v. Bill Watson’s Investments, Inc., 458 So.2d 167 (La.App. 5th Cir.1984). We reject this argument for two reasons. First, the trial judge did not entirely reject the testimony of the treating physicians and accept that of Dr. Aiken instead. The treating physicians’ opinions that plaintiffs were indeed injured in the accident were accepted, in |inspite of Dr. Aiken’s testimony to the contrary. Second, as this court explained in Bates v. Willis, 613 So.2d 691 (La.App. 5th Cir.1993), the weight to be given even to a treating physician’s opinions is largely dependent upon the physician’s qualifications and the facts upon which his opinions are based. Here, both Drs. Brickman and Phillips admitted that they did not have many facts about plaintiffs previous injuries and residual symptoms, nor did they know that both men continued to do heavy labor after the accident. Given these circumstances, we find no error in the trier of fact’s determination that the injuries sustained by the plaintiffs did not persist for as long as the treating physicians thought.
As to the awards of general damages, the standard of review is whether the trial judge abused his much discretion in fixing the award, Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). In Youn the court reiterated the longstanding rule of Reck v. Stevens, 373 So.2d 498 (La.1979) that the role of the appellate court is not to fix an award that it deems appropriate to the ease, but rather to determine whether, based on the effect of the *1039 particular injuries on the particular plaintiff in the particular circumstances in which plaintiff finds himself, the award is an abuse of discretion of the trier of fact. It is only when the appellate court finds, for articulable reasons, that such an abuse has occurred that it may then look to other cases involving similar injuries to similarly situated plaintiffs for guidance. In the present case, considering the nature of the injuries found by the trier of fact and their impact on the particular plaintiffs here, we are unable to articulate any reasons why the awards of general damages are excessively low. We therefore must affirm these awards.
The final issue raised by plaintiffs here concerns the expert witness fees awarded by the court. Plaintiffs contend that Dr. Phillips charged each of them $1,575, and the court only awarded a total of $2,000 for this witness. The Infixing of expert fees is left to the wide discretion of the trial court, and such fees will not be overturned absent an abuse of that discretion, Trans Louisiana Gas Co. v. Heard, 629 So.2d 500 (La.App. 3rd Cir.1993). In the above case the court set forth a number of factors to be considered by trial judges in fixing such fees, including the amount charged by the expert, the time spent in compiling reports and in preparing for and testifying at trial, the expertise of the expert, and the degree to which the expert’s opinion aided the court in reaching a decision. In the present case, and considering the above factors, we find no abuse of discretion in the fees awarded. Plaintiffs also seek a fee for Donald Scion-eaux, the auto repairman who testified to having fixed Lewis’s car after a prior accident. However, this witness was presented as a fact witness, rather than as an expert, and no request for an expert fee was ever urged in the district court. We therefore reject this request as well.
For the foregoing reasons, the judgment of the district court is hereby affirmed.

AFFIRMED.