639 So.2d 275 (1994)
Ronald L. WILLIAMS
v.
GENERAL MOTORS CORPORATION, et al.
No. 93-CA-0287.
Court of Appeal of Louisiana, Fourth Circuit.
February 11, 1994.
Opinion on Grant of Rehearing June 15, 1994.
*276 Michael A. McGlone, Kent B. Ryan, Lemle & Kelleher, New Orleans, for intervenor-appellant.
Stephen P. Bruno, Natasha Zimmerman, Bruno and Bruno, New Orleans, Laurence E. Larmann, Kurt D. Engelhardt, Hailey, McNamara, Hall, Larmann & Papale, Metairie, for appellees.
B. Frank Davis, Howard B. Kaplan, Karen Wells Roby, Bernard, Cassisa, Saporito & Elliott, Metairie, for appellant.
Before BYRNES, LOBRANO, WARD, PLOTKIN and WALTZER, JJ.
BYRNES, Judge.
At approximately 10:00 p.m. on the evening of March 17, 1987, Ronald L. Williams, a safety and training specialist with Ocean Drilling and Exploration Company (ODECO) for eight (8) years was driving a 1985 Buick Century manufactured by General Motors. Mr. Williams alleged that a steering failure caused the vehicle to veer sharply to the left on I-10, striking the left guardrail and then veer to the right striking the right guard rail, resulting in serious injuries and damages. As a result of those injuries and damages, Mr. Williams brought this products liability suit against the manufacturer of the vehicle, General Motors, as well as Crown Buick Inc., Prudential Property and Casualty Insurance Company, Sears and Roebuck, and his wife Betty Williams. All defendants with the exception of General Motors were dismissed. No one has appealed those dismissals.
In the trial court, the jury found in favor of Mr. Williams awarding him general damages in the sum of $750,000; past medical expenses in the sum of $197,000; past lost wages in the sum of $150,000 and future lost wages in the sum of $100,000, together with interest and costs.
The Judgment also ordered that:
1. Murphy Exploration and Production Company [as successor to ODECO] be reimbursed by preference the sum of $106,588.56 for medical expenses, but reduced by $30,000 as attorney fees to the plaintiff's attorney Stephen Bruno, Esq., together with interest and costs.
2. Murphy Exploration and Production Company [as successor to ODECO] be reimbursed by preference the sum of $34,594.07 paid in indemnity benefits from the $150,000 awarded for past lost wages but reduced by $10,000 attorney fees in favor of plaintiff's attorney, Stephen Bruno, Esq., together with interest and costs.
3. The Motion for Directed Verdict in favor of Crown Buick be granted, dismissing it as a party defendant.
4. The Motion for Directed Verdict in favor of Prudential Property and Casualty Insurance Company be granted, dismissing it as a party defendant on the main demand.
5. General Motors Corporation pay to Prudential Property and Casualty Company the sum of $5,925.00 on the third party demand, together with interest and costs.

I. THERE WAS NO MANIFEST ERROR IN THE JURY'S FINDINGS ON LIABILITY

The crux of this case was succinctly expressed by the questions contained in the following two interrogatories which were propounded to the Jury:

*277 1. Did the 1985 Buick Century have a defect at the time it was manufactured?
2. Did the defect cause or contribute to any injuries sustained by Ronald Williams?
The jury answered "yes" to both of these questions. Only if we find that the jury was manifestly erroneous/clearly wrong in answering these two questions can we reverse the judgment of the trial court on the core issue of liability.
This is a classic case of conflicting witnesses and conflicting experts. As this Court said in Brewhouse v. New Orleans Public Service, 614 So.2d 118 (La.App. 4 Cir.1993).
Our standard of review is set forth in Rosell v. ESCO, 549 So.2d 840 (La.1989); Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La.1987); and Miller v. Miller, 602 So.2d 330 (La.App. 4 Cir.1992) which stand for the following: When findings are based on determinations regarding the credibility of witnesses, the manifest-error clearly wrong standard demands great deference to the trier of fact's findings both express and implicit even though the appellate court may feel that its own evaluations and inferences are as reasonable; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
In reviewing contrasting expert testimony, the trier of fact has the responsibility to determine which evidence is the most credible.
The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record) but also upon the proper allocation of trial and appellate functions between the respective courts. Appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.
Thus, where there is conflict in the testimony, reasonable inferences of fact should not be disturbed upon review, even though the appellate court is convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Rosell v. ESCO, 549 So.2d at 844. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d at 844. General Motors' expert testified that the accident could not have been caused by a defect in the vehicle. Plaintiff's experts testified to the contrary. The jury apparently believed plaintiff's experts.
General Motors argued that the accident was caused by driver error with intoxication as a contributing factor. The jury apparently found plaintiff's testimony that he was not intoxicated and that the steering failed credible. This was corroborated by his brother's testimony. The policeman who investigated the accident made no note of any evidence of intoxication.
Reviewing the record of conflicting testimony of experts and witnesses in light of the foregoing, we cannot say that the jury's findings were manifestly erroneous/clearly wrong.

II. GENERAL MOTORS WAS NOT PREJUDICED

General Motors was not materially prejudiced when plaintiff's expert testified for the first time at trial that in addition to his theory that a crack in the spring of the rack and pinion assembly caused plaintiff's accident, it was also possible that the rack and pinion could have become temporarily disengaged. This second possibility had never been mentioned before the trial, in spite of the fact that the expert had been twice deposed.
One major purpose of discovery is to prevent trial by ambush. This court will not allow a party to be prejudiced by last minute, surprise evidence to which that party is given no adequate opportunity to respond. In this case it does not appear that an ambush was intended. Additionally, General Motors was given an adequate opportunity to respond to the new theory. The trial court allowed General Motors three (3) days to prepare its cross-examination of plaintiff's expert, Mr. Mizen, with respect to the new theory. During this time, General Motors conducted *278 tests using the already prepared exemplar vehicle in order to refute the testimony. General Motors already had an expert, Peter Rogousky, who was fully conversant with the technical workings of the rack and pinion steering gear. He demonstrated his opinion to the jury using a cut away of a rack and pinion steering gear. General Motors, as the manufacturer of the mechanism was certainly familiar with its mechanical structure and operation.
In denying General Motor's motion for a new trial the trial court found that "... defense counsel [General Motors] handled the trial skillfully and was not prejudiced by the second theory of Plaintiff's expert."
This is a close case, but the record is adequate to support this conclusion.

III. THE ADVERSE PRESUMPTION RULE DOES NOT APPLY

The Williams' damaged vehicle was taken to Jackie Rowan's Automotive Repair. An employee of the repair shop discarded the rack and pinion steering assembly. Mr. Williams, therefore, could not produce those parts at the trial in support of his claim that they were defective. General Motors asserts that Mr. Williams' failure to produce those parts in court creates a presumption that the evidence would have been unfavorable to his cause.
Where a litigant fails to produce evidence available to him and gives no reasonable explanation, the presumption is that the evidence would have been unfavorable to him. Boh Brothers Construction v. Luber-Finer, Inc., 612 So.2d 270 (La.App. 4 Cir.1992), and Wilson v. U.S. Fire and Casualty Company, 593 So.2d 695 (La.App. 4 Cir.1991).
The record supports Mr. Williams' contention that the part was inadvertently discarded when it was mistaken for scrap metal by an employee of Jackie Rowan's Automotive Repair Shop.
Therefore, Mr. Williams provided a reasonable explanation for his failure to produce the evidence in court and no such unfavorable presumption applied. Bourgeois v. Bill Watson's Investments, Inc., 458 So.2d 167 (La.App. 5 Cir.1984); Babineaux v. Black, 396 So.2d 584 (La.App. 3 Cir.1981).
It should be noted that the Boh Brothers case cited by General Motors followed and relied on the Bourgeois and Babineaux cases. The facts in Bourgeois are remarkably similar to the instant case, with the exception that in Bourgeois the plaintiff had to account for the disappearance of the entire automobile, not just a damaged part. The plaintiff explained that she had been required to sell her car to her insurance company in order to recover property damages. This was found to be an adequate explanation.
On the other hand in Boh Brothers the party litigant had custody of the item when it disappeared, no compelling reason to discard it, and knew of its importance. Contrariwise, in this case, the part in question was not in the custody of the plaintiff. Nothing in the record indicates that the part was lost due to the negligence or deliberate act of the plaintiff. It was in the custody of a third party repair shop which admitted responsibility for mistaking the rack and pinion steering gear for scrap metal and discarding it.
Moreover, in Boh Brothers the actual ruling of this Court was to set aside the jury verdict because the trial court failed to instruct the jury that the litigant could explain its failure to produce the missing item which is the reverse of the situation in the instant case. Boh Brothers does not support General Motors' position.
The case of Wilson v. U.S. Fire and Cas. Co., 593 So.2d 695 (La.App. 4 Cir.1991), also fails to support General Motors' position. In the Wilson case where a party failed to call a witness on his witness list, this Court found that:
1. As no jury instruction was requested on the issue, it could not be considered on appeal.
2. As both parties could have called the witness no presumption was created in favor of or against either party.
3. "The adverse presumption rule suggested by plaintiff must be tempered by the proposition that a party to a lawsuit need only to prove his case. If he does so *279 by calling one or more witnesses to testify concerning an issue, he should not be penalized because he fails to call still another witness on the subject." Wilson, 593 So.2d 695, 700.
The record cannot support a finding that the missing part was in plaintiff's custody. Nor can it support a finding that the part was lost through any negligent or intentional act on the part of the plaintiff. Had the jury concluded otherwise it would have been manifestly erroneous/clearly wrong.
In view of the foregoing, if the failure of the trial judge to instruct the jury on the adverse presumption rule was error, it was harmless error.

IV. THE RECORD SUPPORTS THE AWARD FOR LOSS OF FUTURE EARNINGS

Plaintiff asserts that the testimony of his expert economist, Mr. Wolfson, that plaintiff had a loss of future earnings in the sum of $385,000 was uncontroverted. Therefore, the jury was clearly wrong in awarding the plaintiff only $100,000 for loss of future earnings. This Court does not agree.
It is well settled that an award of damages may not be disturbed on appeal absent an abuse of discretion by the trier of fact. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Reck v. Stevens, 373 So.2d 498 (La.1979). Furthermore, uncontradicted expert testimony regarding lost future income is not binding on the court. Matthias v. Brown, 551 So.2d 821 (La.App. 3 Cir.1989); Morvant v. Smith, 463 So.2d 75 (La.App. 3rd Cir.1985).
At the time of the accident at issue, Mr. Williams was employed as a safety specialist on oil rigs with ODECO. Thomas Roundtree, Personnel Specialist with ODECO, testified that ODECO, like other oil companies in Louisiana, suffered severe cutbacks in the late 1970's and 1980's causing ODECO to lay off numerous employees. Ultimately, ODECO ceased to exist as a separate entity in Louisiana and is now part of Diamond M in Houston, Texas.
Based on the testimony of Mr. Roundtree and the general knowledge of the deterioration of the Oil industry in Louisiana, the jury had a factual basis to discount the testimony of Mr. Wolfson. The plaintiff's compensation had been consistently declining in the years prior to the accident. The jury had ample factual evidence to conclude that Mr. Wolfson's assumption regarding work life advancement and raises would not occur.

V. IT WAS ERROR TO AWARD FEES TO PLAINTIFF'S ATTORNEY OUT OF MURPHY'S RECOVERY

The jury returned a verdict in plaintiff's favor on October 22, 1992 in the amount of $1,197,000.00. By Amended Judgment, the Court awarded Murphy Oil $106,588.56 as reimbursement for medical expenses paid on behalf of or to plaintiff which funds were to be paid in preference from plaintiff's recovery of $197,000.00 for past medical expenses. The Court ordered Murphy Oil to pay $30,000.00 in attorney's fees to plaintiff's counsel from its award for medical expenses paid. Additionally, the Court awarded $34,594.07 to Murphy Oil as reimbursement for the compensation payments paid to plaintiff to be paid in preference from the $150,000.00 for past lost wages awarded to plaintiff. However, the Court awarded plaintiff's counsel $10,000.00 as attorney's fees from Murphy's $34,594.07 award. The trial court provided reasons for judgment concerning the awards of attorney's fees to be deducted from Murphy's awards on November 11, 1992.
It was error for the trial court to order Murphy Oil to pay attorney's fees to plaintiff's attorney. Murphy Oil was represented by its own attorney, not by plaintiff's counsel. The trial court's reliance on Moody v. Arable, 498 So.2d 1081 (La.1986) is misplaced. In Moody the Supreme Court held that when an injured worker sues a third party in tort and that worker's employer or his workers' compensation carrier intervenes for recoupment of workers' compensation paid to the worker, the employer or carrier is obliged to pay a portion of the attorney's fees of the worker if the worker succeeds in recovering funds from which the employer or carrier realize recoupment. The Supreme Court based this holding on its conclusion that under the Louisiana Worker's Compensation *280 Act, La.R.S. 23:1021 et seq., the employer or compensation carrier is a co-owner with the injured worker "of a property right consisting of a right to recover damages from the third person." It is only this right of co-ownership which entitles the injured worker to recover attorney's fees from the employer/compensation carrier if the attorney for the worker is determined to have been responsible for securing the award from which the employer/compensation carrier recoups compensation payments.
Plaintiff in his brief acknowledges that Murphy's right of recovery is based on subrogation, not co-ownership. The recent effort of this Court to resist the expansion of Moody as expressed in Wiedemann & Fransen v. Highlands Ins., 617 So.2d 105 (La. App. 4 Cir.1993), writ denied 619 So.2d 552 (La.1993), is equally applicable to this Case:
"We agree with McLain v. Caddo Parish School Bd., 599 So.2d 878 (La.App. 2 Cir. 1992), writ denied, 605 So.2d 1123 (La. 1992) where the court took the position that efforts to expand the scope of Moody v. Arabie, should be resisted.
It is clear that the lynchpin of Moody v. Arabie is co-ownership of a single property right.
* * * * * *
Efforts to extend the rationale of Moody v. Arabie, to cases beyond recovery from a third party tort feasor by the employee or employer in a worker's compensation setting have been resisted." Id., 617 So.2d at 106.
This is consistent with the opinion of this Court in Charity Hosp. of Louisiana v. Band, 593 So.2d 1392 (La.App. 4 Cir. 1992). In Charity Hosp. the attorney sought to apply his 40% contingent fee contract to funds recovered on behalf of his client, but which were subject to a privilege in favor of and owed to Charity Hospital. This Court made the following pronouncement:
In Moody v. Arabie, supra, the issue was whether an employer (or its compensation insurer) was obligated to pay a portion of the employee's attorney fees in a third party tort suit. The Supreme Court concluded that since the employer had a preference up to the amount of the compensation paid, on the settlement and/or judgment proceeds in the employee's third party claim, each party (employer and employee) were co-owners in the litigious right. As co-owners each were responsible for their pro-rata share of the litigation costs, including attorney fees. Broussard v. Olin, supra [546 So.2d 1301], used the same rationale and reached the same conclusion.
We find Moody distinguishable from the instant case. Where an employee is injured by the tortious acts of a third party, either the employer who pays compensation or the employee, or both can file suit. La.R.S. 23:1102(A)(B). Thus by specific statute, the employer is granted a property right in the claim of the injured employee. In the instant case, Charity is the creditor of McCrimmons. Absent a legal or conventional subrogation by McCrimmons, Charity has no independent right to seek from the tortfeasor the medical expenses incurred by McCrimmons. The law (R.S. 9:4751, et seq.) only provides that Charity have a privilege on any funds received by McCrimmons from another person on account of the injuries. Charity Hosp. of Louisiana v. Band, 593 So.2d 1392 (La. App. 4 Cir.1992). (Emphasis added).
Thus, in Charity Hosp. this Court pointed to the aggregation of the following factors which the Supreme Court considered in arriving at its conclusion in the Moody case:
1. Either the employer/compensation carrier or the injured employee, or both can file suit.
2. The employer/compensation carrier had a preference up to the amount of compensation paid, on the settlement and/or judgment proceeds in the employee's third party claim.
3. The existence of a specific statute, LSA-R.S. 23:1102(A)(B), which establishes the first two rights.
4. The parties have co-ownership of a litigious right.
Such an aggregation of factors does not exist in the instant case.
*281 Miguez and Leckband v. Holston's Ambulance, 614 So.2d 150 (La.App. 3 Cir.1993), is inapposite. In Miguez there was no issue of co-ownership. In Miguez the attorneys for the injured worker obtained judgment proceeds in the amount of $11,970. Holston's Ambulance, a health care provider, claimed the entire proceeds of the judgment leaving nothing for the attorneys who obtained the proceeds. The court simply held that the privilege for attorneys fees provided by LSA-R.S. 9:5001 "primes the privilege set forth in LSA-R.S. 9:4752 for medical providers." This only becomes an issue where the proceeds of the judgment are inadequate to reimburse the health care provider and pay the attorney's contractual contingent fee. That is not a problem in the instant case. Mr. Bruno does not argue that the balance of the proceeds from this judgment after reimbursement is made to Murphy will be inadequate to pay his fee. In effect, Miguez is nothing more than a "ranking of liens" case.
Southern Farm Bureau Cas. Ins. v. Sonnier, 406 So.2d 178 (La.1981), is also distinguishable. There was no issue of attorney's fees. In Southern Farm Bureau the parents of the decedent obtained a judgment of $103,160 against the railroad tort-feasor. (See the appellate opinion, 396 So.2d 996, 997.) After obtaining the judgment for $103,160, the parents of the decedent agreed to settle with the tort-feasor for $90,000. Seven days after the settlement Southern Farm Bureau Casualty Insurance sued[1] the decedent's parents for the $2758.40 it had paid them for their son's funeral expenses, "alleging the settlement destroyed its conventional subrogation under the policy against the railroad in violation of the policy provisions."
The Supreme Court held that the insurance company had only a right of partial subrogation to its insured's claim against the tort-feasor to the extent of the $2758.40 it had payed for funeral expenses. Because the $90,000 obtained in settlement was only part of what the parents were entitled to under the judgment, i.e., $103,160, they were entitled to preference for the balance of their claim against the tort-feasor:
Nevertheless, subrogation cannot injure the creditor, since, if he has been paid but in part, he may exercise his right for what remains due, in preference to him from whom he has received only a partial payment. La.C.C. art. 2162. Thus, when the creditor has received from the subrogee a partial payment only, the credit is divided between them; the original creditor remains creditor for the unpaid portion and the subrogee becomes creditor to the extent of the payment he had made. Southern Farm Bureau Cas. Ins. v. Sonnier, 406 So.2d at 180.
What the Supreme Court meant in Southern Farm Bureau was that the decedent's parents were entitled to a preference over the insurance company on all sums recovered from the tort-feasor until they were paid $100,401.60, i.e., the $103,160.00 amount they were awarded in the judgment less the $2,758.40 to which the insurance company was subrogated. Therefore, when the decedent's parents settled for $90,000 they ended up with $10,401.60 less from the tort-feasor than the amount to which they were entitled to recover in preference to the insurance company.[2]
Plaintiff argues that Southern Farm stands for the proposition that Murphy's recovery as subrogee must be reduced by the *282 amount of the attorney's fees plaintiff's attorney charges him on the portion awarded to Murphy based on the Supreme Court's pronouncement that "... the subrogee can only claim that which remains after the subrogor has been paid." Southern Farm Bureau Cas. Ins. v. Sonnier, 406 So.2d 178, 180.
If plaintiff's subrogation argument were carried to its logical conclusion, Mr. Williams would be entitled to a dollar for dollar reduction of what he owed to Murphy for every dollar he owed to his attorneys, leaving nothing to Murphy. This is clearly not what was intended by the Supreme Court in Southern Farm Bureau. That case stands only for the proposition that the recovery of a partial subrogee of the injured party (Murphy in the instant case) may be reduced by an amount equal to the difference between what the injured party actually collects from the tort-feasor and what the injured party was entitled to collect from the tort-feasor. It is the amount recovered from the tort-feasor that determines what the partial subrogee is entitled to, not the amount the injured party nets after various expenses, such as attorney's fees. Plaintiff acknowledges in his brief that "he recovered the full amount of his past wages and medical expenses from the Judgment."
Plaintiff has failed to cite any authority that would support his contention that he is entitled to deduct attorney's fees from the portion paid to Murphy based on a theory of quantum meruit. The cases cited by plaintiff, Succession of Butler, 294 So.2d 512 (La. 1974), and Oppenheim v. Bouterie, 505 So.2d 100 (La.App. 4 Cir.1987), have no bearing on this case.
In Succession of Butler an attorney was seeking to enforce a contingency fee contract for approximately $72,000 against his own client. In that case the court held that the contingency fee contract was contra bonos mores and, therefore, unenforceable. However, the court allowed the attorney to recover fees from his client on a quantum meruit basis in the much lesser sum of $25,000, recognizing that a true attorney-client relationship existed.
In Oppenheim v. Bouterie, 505 So.2d 100 (La.App. 4 Cir.1987) this Court quoted the case of Guillory v. Guillory, 339 So.2d 529, 531 (La.App. 4 Cir.1976) to the effect that "... attorney's fees incurred by the wife in prosecuting a suit for separation from bed and board or divorce is an obligation of the community which ... must be paid out of community assets on a quantum meruit basis...." The application of community property law to a claim for attorney's fees is irrelevant to Mr. Williams' claim for attorney's fees from an unrelated third party. If there is any analogy to be drawn, it would be to the language of this Court from Guillory that was omitted by the ellipsis at the end of the quotation above where this Court went on to finish that sentence by stating that:
"... but if there are no community assets, there is no liability on the part of the husband separately for such fees." [Emphasis added]. Guillory, 339 So.2d at 531.
In Moody v. Arabie, 498 So.2d 1081 (La. 1986) the Supreme Court stated:
"The trial court held that the worker's attorney was entitled under his contingency fee contract with the worker to collect one third of the gross recovery because La.R.S. 9:5001 grants an attorney a first privilege on a judgment obtained by him and on property recovered thereby. The Court of Appeal reversed, holding that because the employer was not a party to or a debtor under the contingent fee contract the accessory right of privilege established by La.R.S. 9:5001 could not affect proceeds due to the employer under the judgment. 485 So.2d 660. We agree with and affirm that part of the Court of Appeal judgment." (Emphasis added) Id. at p. 1083.
Our holding in this case is consistent with Moody. The trial court erroneously awarded attorney's fees out of Murphy's recovery for reimbursement for plaintiff's medical expenses and lost past wages.

VI. PRUDENTIAL IS ENTITLED TO BE REIMBURSED FOR PROPERTY DAMAGE PAYMENTS

Donald Williams, plaintiff's brother, was a passenger in the vehicle at the time of the accident. Donald Williams filed suit against Prudential Property & Casualty Insurance *283 Company as the liability insurer of Betty Williams, plaintiff's wife, in whose name the defective Buick was registered. Prior to trial Prudential settled Donald Williams' bodily injury claim for $5,925.00. Prudential filed a cross-claim against General Motors seeking reimbursement of the $5,925.00 it paid to Donald Williams as well as $5,278.73 it paid to Ronald and Betty Williams under the collision portion of the policy it had issued to Betty Williams.
In support of its cross-claim for reimbursement for property damage Prudential introduced a copy of the damage estimate and the testimony of Gill Chisholm, an ex-Prudential employee who testified regarding the estimate and amount of property damages paid to Ronald and Billy Williams.
Prudential was dismissed as a party defendant by way of directed verdict. That decision is not challenged on this appeal. In its judgment in favor of Ronald Williams and against General Motors Corporation the court also awarded Prudential $5,000 on its third party demand/cross claim against General Motors. Prudential filed a Motion to Amend the Judgment, and the trial court amended the judgment, increasing the award in favor of Prudential to $5,925.00, the exact amount Prudential paid to Donald Williams in settlement of his bodily injury claim.
Prudential contends that in spite of having introduced sufficient uncontroverted evidence at the trial to support its additional claim of $5,278.73 for property damage reimbursement, the trial court judgment is silent on the matter. The record supports this contention. This Court accepts Prudential's explanation that there was an inadvertent oversight on the part of the trial court.

DECREE
For the foregoing reasons, the judgment of the trial court is amended to award the sum of $5,278.73 in favor of Prudential Property & Casualty Insurance Company and against General Motors Corporation, said $5,278.73 to be in addition to the sum of $5,925.00 already awarded to Prudential by the judgment of the trial court.
The deduction by the trial court of $40,000 in attorney's fees in favor of plaintiff's attorney, Stephen Bruno, Esq. from the sums awarded to Murphy Exploration and Production Company as reimbursement is reversed.
The balance of the judgment of the trial court is affirmed.
AFFIRMED IN PART;
AMENDED IN PART;
AND REVERSED IN PART.
LOBRANO, J., concurs.
WARD and PLOTKIN, JJ., dissent.
LOBRANO, Judge, concurring.
If I were the fact finder in this case I would have rejected Mizen's theories of causation. I consider those theories "could have" theories, i.e. the accident "could have" happened this way or that way. I do not believe the accident was caused by either of Mizen's theories. The jury, however, thought otherwise.
Since I am not the fact finder, and our stringent standard of appellate review precludes me from substituting my judgment for that of the jury, I concur in the majority result. See, Stobart v. State through DOTD, 617 So.2d 880 (La.1993), and the cases cited therein.
WARD, Judge, dissenting.
I respectfully dissent because there was trial error which probably led to an injustice and a wrong jury verdict; and even without error, the jury verdict is manifestly erroneous.
There was crucial trial error because Williams proceeded to trial on the theory that the torsion bars that reduce steering wheel tension were manufactured defectively. After Williams's expert, Neil Mizen, testified and was cross-examined, it was apparent that Williams could not prove a defective torsion bar. Only then did Williams ask for Mizen's expert opinion as to the rack and pinion assembly, and only then did Mizen say Williams's accident "could have" been caused by a defective rack and pinion assembly. The trial judge erred by not granting a mistrial *284 when Mizen gave this answer. Williams had proceeded on one theory of a defect, the torsion bars, and then was permitted to switch to another in the middle of trial. This was permitted, in spite of months of pretrial discovery directed not to the rack and pinion assembly but to the tie rods.
The trial court erred by not granting a continuance after Williams changed the basis of his claims from design defect in the torsion bar to that of a manufacturing defect in the rack and pinion assembly. Discovery proceeded throughout on the basis of Williams' allegations that the torsion bar prematurely disengaged, and it was unfair to permit Williams to change the allegations to rack and pinion manufacturing defect three days after trial began. GMAC took writs to this Court but this Court found there was adequate remedy on appeal. If we do not either disregard that testimony or remand for a new trial then we are not giving an adequate remedy on appeal. It is irresponsible for this Court to now say that the error was harmless.
Next, the jury verdict was manifestly erroneous and should be reversed. Even by the high standards now in place for appellate review of facts, I would find that the findings were manifestly erroneous. Ronald Williams simply did not prove his case by evidence to show that it was more probable than not that GMAC manufactured an automobile with a defective steering mechanism.
First and foremost, when a suit is predicated upon claim of a product that was manufactured defectively it is incumbent upon that plaintiff to prove it, and the best way to prove it is to produce the defective product, in this case neither the torsion bar or the wrack and pinion steering assembly were produced. When plaintiff cannot produce it, either through his fault or because of the negligence of his agent, there is a certain amount of inequity to deny to the defendant, GMAC, its most crucial and important piece of evidence. Somehow, the rack and pinion assembly which was removed from Williams' vehicle after the accident by Williams' mechanic was lost, and neither Williams' expert nor General Motor's experts were able to examine the part for defects. Moreover, Jackie Rowan, who was the mechanic that removed the rack and pinion, did not testify that he examined the part and found it defective. Rowan testified that when he removed the allegedly defective rack and pinion, there was no visible damage to the housing of the component. He did not dismantle the component to inspect the interior of the partan omission which casts grave suspicion on his testimony as an expert since, if for one moment he believed it to be defective, he would have removed the housing and dismantled the rack and pinion. Moreover, Rowan did not retain the assembly. He says that he discarded it for scrap. As a consequence, not one person was able to testify that they examined the alleged defective part and found it defective. While the disappearance of the evidence may not create a presumption that it was unfavorable, it does materially affect the credibility of the experts who testified for Williams, particularly those who had an opportunity to preserve it and did not. Under these circumstances, plaintiff's proof must be of high quality, and certainly it should rise to far more than the shoddy evidence produced in this trial.
Just how shoddy was that evidence? His own testimony undercuts his expert's testimony, making it worthless.
In his trial testimony Williams explained how the accident occurred, on the Interstate 10:
I was doing somewhere between 50 to 60 miles per hour. All of a sudden, I felt a vibration in my steering wheel. I said to my brother, something is wrong, this wheel just vibrated in my hand ... I was attempting ... [to] turn to the right and get over, and the car just took off to the left ... I was trying to turn the wheel to the right, but the car .. hit the embankment [sic] ... By the time I recovered from that, we were hit in the right side of the interstate. (Tr. T. Vol. VI, p. 545-546).
Williams' testimony indicates that the car responded conversely to the way he turned the wheel. Curiously, his mechanic, Rowan, testified that he test drove Williams' vehicle after he made front end repairs but prior to replacing the rack and pinion and found that the steering wheel displayed a 15 degree *285 "play," meaning that the steering was not immediately responsive. When tested, the vehicle did not veer in a direction opposite from the direction in which the wheel was turned, as Williams described it. Darryl Abbott, a Rowan employee, test drove the vehicle as well and he, like Rowan, did not find that when he turned the steering wheel in one direction that the front wheels turned in the opposite direction.
Neither Rowan nor Abbott were qualified to testify as experts because the only basis for their opinion could have been Williams's account of what occurred, and it was obviously diametrically opposed to what Rowan relied upon to form an opinion. Rowan should not have been permitted to testify when the factual foundation of his opinion was denied by Williams.
Even when not contradicted by himself, Williams' expert's testimony was not sufficient. His expert, Neil Mizen, first testified on direct examination that in his opinion GMAC manufactured defective torsion bars which caused the failure of the steering mechanism. After cross-examination, when that theory was discredited, Williams asked Mizen on redirect as to whether the accident could have been caused by a defective rack and pinion steering assembly, to which Mizen replied it "could have." I do not regard this as sufficient proof. It is speculative. At the very least the expert must testify that it was more probable than not that there was a defective part. Mizen's testimony does not rise to the quality of proof which Courts must demand when an expert is permitted to give an opinion.
Other evidence leads me to believe Williams' claim of mechanical defect is incredible. The Williams' vehicle had been driven in excess of 30,000 miles with no indication of a problem prior to this incident. It is astonishing that a fact finder would conclude that Williams' vehicle had a manufacturing defect, one that had not surfaced within two years of manufacture and after 30,000 miles of use, a defect which somehow suddenly appeared and caused this strange accident.
I believe a far more credible explanation of the accident is driver defect. As a matter of fact, I believe it is the only logical conclusion. Williams left at 6:00, and picked up his brotherto go to his employer's place of business to get his paycheck. And it may be nothing more than a coincidence, but more than four hours after Williams left home and when he was examined in the emergency room, the nurse smelled alcohol on his breath. He admitted drinking the "proverbial two beers." And, Williams has never given a credible account of his time for the four hours between leaving home and the 10:00 P.M. accident. A credible explanation is that the accident occurred because Williams while driving under the influence of alcohol lost control, hitting one side of the guard rail and bouncing over into the other. While appellate judges should not substitute their findings of fact for that of the jury's, they are not required to leave their common sense and experience at home.
These facts, when considered with Williams' failure to produce the "defective" part and his mechanic's failure to dismantle and examine the rack and pinion assembly, lead me to conclude that Williams failed to prove his case. There was no manufacturing defect; it was a driver defect. For the jury to award Williams over $1,000,000 dollars for injuries that I believe are solely attributable to him is manifestly erroneous.
PLOTKIN, Judge, dissenting with reasons.
The institution of law must insure that justice is not limited to one side of a case, but is fair and impartial to all parties.
I agree with Judge Ward's dissent. I add these additional reasons because the defendant, General Motors, was deprived of a fair trial.
This case is a complex product liability jury trial. The majority affirms the trial court judgment on the basis of a superficial manifest-error analysis. To support its conclusion, the majority discusses perfunctorily two critical factual and legal issues: (1) admission of plaintiff's expert witness' new theory during trial and (2) spoliation of evidence.
*286 NEW THEORY DURING TRIAL
It is uncontradicted that the plaintiff's pre-trial theory, advanced by plaintiff's expert witness, Mr. Mizen, which was based on torsion spring failure, was discredited during trial. Without any prior notice, three days into the trial, for the first time, plaintiff's expert witness testified that it was possible that the rack and pinion could have become temporarily disengaged and caused the accident. The majority found no prejudice to General Motors because it had three days to prepare a response, although it had almost five years to prepare for trial and was diligent in ferreting out all factual questions during pre-trial.
The Louisiana Supreme Court recently addressed the objectives of discovery in Moak v. Illinois Central Railroad Co., 631 So.2d 401 (La.1994), stating as follows:
This Court, in Hodges v. Southern Farm Bureau Casualty Insurance Co., 433 So.2d 125, 129 (La.1983), has said that:
[t]he basic objectives of the Louisiana discovery process are (1) to afford all parties a fair opportunity to obtain facts pertinent to the litigation, (2) to discover the true facts and compel disclosure of these facts wherever they may be found, (3) to assist litigants in preparing their cases for trial, (4) to narrow and clarify the basic issues between the parties, and (5) to facilitate and expedite the legal process by encouraging settlement or abandonment of less than meritorious claims.
To achieve these objectives, the courts are to construe the discovery statutes liberally and broadly. Id. (citing Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); Burns v. Thiokol Chemical Corp., 483 F.2d 300 (5th Cir.1973); 8 Wright & Miller, Federal Practice and Procedure, § 2001, p. 17 (1970 ed.)).
Id., at 403. Further in the opinion, the court stated as follows:
The rationale for liberal pre-trial disclosure is "to make trial `less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent.'" Daniels v. National Railroad Passenger Corp., 110 F.R.D. 160, 161 (S.D.N.Y.1986) (quoting United States v. Procter & Gamble Co., 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958)). Discovery serves to eliminate prejudice from the surprise disclosure of evidence. While it has been suggested that surprise may have "a healthy prophylactic effect against possible perjury," it is more likely that the adversarial process will function efficiently and cases will be decided fairly on the merits if the parties are aware of all of the evidence.
Id., at 405.
The trial court either should have excluded the expert's testimony because it was not disclosed prior to trial or should have granted a mistrial. The failure to identify this new theory in advance of trial unfairly deprived the defendant of the ability to respond in a timely and prepared manner. Trials are pressure-compacted events. In routine trials, continual crises occur. It is unconscionable and inappropriate to force a party to engage in pre-trial preparation, discovery and investigation of a new theory of recovery during a trial. Forcing the defendant to investigate and rebut a new theory as to the cause of the accident, which normally occurs during pre-trial, during a trial, is unfair, harmful and prejudicial to the party. The record supports the prejudice to the defendant. From the time of the opening statements to the time of Mr. Mizen's change in theory, all evidence and examination of witnesses presented was directed to plaintiff's original theory that the spring in the rack and pinion unit broke because of a metallurgical or manufacturing error, which was manufacturing defect. The jury could not possibly comprehend the subtle but significant effects of the change of theory midway during the trial and render a fair verdict. Liner v. City of Houma, 423 So.2d 93 (La. App. 1st Cir.1982).
Additionally, plaintiff's expert witness, Mr. Mizen should not have been permitted to testify that "possibly the rack and pinion steering temporarily became disengaged," causing the accident. The Supreme Court of Louisiana in State v. Foret, 628 So.2d 1116 (La.1993) adopted the standards for expert *287 witnesses established by the United States Supreme court in Daubert v. Merrell Dow Pharmaceuticals, ___ U.S. ___, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which held that Federal Rules of Evidence 702, rather than the "general acceptance" standard established by Frye v. United States, 293 F. 1013 (D.C.Cir.1923), controls the admissibility of expert scientific evidence. That rule allows the admission of expert testimony whenever "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." F.R.E. 702.
Under Daubert, trial judges are required to apply a two-step analysis to determine whether expert testimony is admissible. First, the trial judge must determine in a preliminary hearing whether the expert is proposing to testify to actual scientific knowledge. Second, the trial judge must determine whether such knowledge will assist the trier of fact in understanding or determining a fact in issue.
The policy reason for adopting this standard was to exclude "junk" science and experts that would testify to anything without any scientific basis. Judges now actively regulate the admission of expert opinions, as gatekeepers, because of the public's illiteracy of science and the inability of jurors of distinguishing between good and bad science.
Mr. Mizen's new theory, that the steering wheel became disconnected from the front wheels when the rack and pinion became separated, is only speculation. He did not perform any tests or examinations or produce any studies to support his theory. Based on the testimony of the plaintiff and the repairmen about the behavior of the vehicle, he speculated that a temporary separation occurred which caused the crash. Based on Foret, an insufficient foundation for the admission of his opinion was presented and his testimony should therefore have been excluded.
Further, as Judge Lobrano points out in his concurrence, the evidence does not support Mizen's new theory of a product defect. If there was a temporary disengagement of the wheels, the driver would have no control over the vehicle. Williams was able to steer his car in both directions. There is no evidence prior to the accident of any steering problems. Most significantly, after the accident, there was no evidence of a temporary disengagement. Two repairmen drove the vehicle and found no evidence of rack and pinion disengagement. It is difficult to conceive, based on this evidence, how plaintiff's expert could tell the court, as a new explanation of product defect, that a temporary disengagement of the rack and pinion device occurred.

SPOLIATION OF EVIDENCE
General Motors was required to defend this product liability lawsuit when the plaintiff claimed a product defect, but was deprived of the opportunity to conduct an examination of the product because of its prior spoliation. Spoliation, in a products liability context, refers to the loss, destruction or material alteration of the product, whether negligent or intentional.
The majority concludes that the missing defective part was not in plaintiff's custody when it was discarded. Therefore, the failure of the trial judge to instruct the jury on the adverse presumption rule was harmless error. I disagree.
Williams selected Jackie's Automotive Repair Shop. Both the plaintiff and Mr. Rowan, the mechanic, were always aware of the pending multiple claims arising out of the accident. Further, Mr. Rowan was specifically asked to retain the defective part.
In a product liability case, the crucial evidence is the object that caused the damage. The ultimate questions are whether a defect existed and, if so, whether the defect caused or contributed to plaintiff's injuries. Preservation of the evidence is essential in order for the plaintiff to meet its burden of proof and for the defendant to defend the claim. The physical object itself and the precise condition of that object after the accident are substantially more reliable and persuasive to a jury than an oral explanation, model or diagram. The product has the capacity to testify through its condition, markings, and operative qualities which demonstrate facts, either supporting or refuting the claim.
*288 In balancing the interests of the parties in this case, a reasonable person could only conclude that the defendant suffered significant prejudice because its discovery and defense rights were significantly affected by the destruction of the evidence. On the other hand, the plaintiff has a substantial advantage because the plaintiff or his expert witness were able to testify based on their observations of a spoliated product, which allows them to reach any opinion they desire. Further, the party responsible for the spoliation is not held accountable, which destroys any incentive to preserve the object.
In McElroy v. Allstate Insurance Co., 420 So.2d 214 (La.App. 4th Cir.1982), authored by Judge Byrnes, the plaintiff gave away the car which was subject to a product liability claim, and the jury was fully informed as to the reasons for disposal. Nevertheless, the Court approved a law charge regarding a legal presumption that the automobile would have been unfavorable to the plaintiff's case had it been introduced into evidence.
In this case, Williams negligently allowed his repairman to dispose of the alleged defective product. Negligent spoliation causes a significant impairment in the ability to prosecute or defend the lawsuit. This spoliation by inference is sufficient to justify the jury instruction allowing it to draw a negative inference from the fact that the evidence was spoliated because there was something unfavorable which had to be concealed or was hidden from the parties. Once the product was destroyed, the plaintiff and his expert were unhampered in the development of their theory. The defendant was forced to structure its defenses on the plaintiff's version of the facts. Given this latitude in a product liability case, the defendant was entitled to the adverse presumption law charge.
Accordingly, for the reasons assigned by Judge Ward and those stated herein, I respectfully dissent and would order a new trial.

ON GRANT OF REHEARING
WARD, Judge.
In this product liability suit Ronald L. Williams claims that he was injured as a result of a defective General Motors' 1985 Buick automobile, his wife's car. At approximately 10:00 p.m. on March 17, 1987, Williams with his brother as a guest passenger, was driving on the I-10 when the Buick Century veered sharply to the left, struck the left guard rail, and then crossed the highway and struck the right guard rail. Although both Ronald and his brother were injured, this suit concerns only Ronald Williams' claims. He sued General Motors as the manufacturer of the Buick, Crown Buick, Inc., as the seller, his wife Betty as the owner, Sears Roebuck who repaired the Buick's brakes, and various insurers, Prudential Property and Casualty Insurance Company. All of the defendants with the exception of General Motors were dismissed.
The jury rendered a verdict in favor of Williams, awarding general damages, past medical expenses, and past and future lost wages of more than $1,000,000.00. General Motors has appealed, arguing that numerous trial errors led to an erroneous and unjust jury verdict. We find that several of General Motors' arguments have merit; that Williams has not proven a manufacturing defect; and we reverse and render judgment in favor of General Motors.
The trial court erred by permitting the jury to receive inadmissible evidence to prove a manufacturing defect. Williams alleged in his petition a design defect in the torsion bar caused him to lose control and was the cause in fact of the accident. General Motors answered and prepared to defend against claims that the Buick's torsion bar was manufactured defectively, and the case proceeded through discovery motions and the early stages of trial on the theory that a design defect in the Buick's torsion bars created problems with the steering wheel tension, causing the Buick to veer to the left out of control. Neil Mizen, an expert for Williams, testified that, in his opinion, a defective torsion bar caused the accident. However, during cross examination, Mizen essentially agreed with General Motors' defensea design defect in the torsion bar would not cause the Buick to malfunction in a manner such as Williams described the accident and the car's performance. Williams *289 could not prove a defective torsion bar. On redirect examination, almost as an afterthought, Williams' counsel asked Mizen if there was any other possible defect that would have caused the accident, and it was only then that Mizen raised the possibility of a manufacturing defect in the rack and pinion steering assembly.
General Motors spent five years researching its case to defend against allegations of a design defect in the torsion bar. Yet over General Motors's objection, after a three day continuance, Williams was allowed to adopt a new theory of causation and to introduce evidence of an alleged manufacturing defect to support this new theory. The trial court's ruling permitting the introduction of this evidence violated the Louisiana Code of Civil Procedure, the established rules of Louisiana Evidence, and the objectives of the discovery procedures. This type of unfair trial proceeding is prohibited by La.C.C.P. Article 1425, which declares that "the subject matter on which the expert is expected to testify, and ... the substance of the facts to which the expert is expected to testify" must be disclosed through interrogatories and depositions. Case law has interpreted this provision to "protect a party from prejudicial surprise at trial by the introduction of evidence not previously known by him to exist, and against which he could not therefore have prepared a rebuttal." Riverland Food Corp. v. Carriage Meat Co., 449 So.2d 1131, 1133 (La.App. 5th Cir.1984).
In a factually similar case, Thibeault v. Square D. Co., 960 F.2d 239 (1st Cir.1992), Thibeault tried to introduce evidence of a defective part which was a different part than the part alleged to be defective in his lawsuit. The Appellate Court there found that the trial court correctly excluded the testimony of plaintiff's expert as to the new theory because "[H]ad the court allowed the tardy supplementation, Square D would have had to scrap much of its earlier preparation in favor of a frantic, last-minute scramble ... and rebut a new and different case concept... [W]e do not think it is either reasonable or fair to expect a litigant to bear so onerous a burden." Thibeault at 247.
Similarly, in this case the trial court erred by allowing the trial to proceed on a new issue which was brought up after three days of trial and for which there was no discovery and no opportunity for General Motors to prepare a defense. Although a trial judge has broad discretion in deciding whether it should permit expert testimony, Schwamb v. Delta Air Lines, Inc., 516 So.2d 452, 459 (La.App. 1st Cir.1987), writ denied, 520 So.2d 750 (La.1988), the trial court erred by permitting the testimony under the circumstances and in the face of discovery articles designed to promote fair trials and to discourage "ambush". The trial court should have excluded the evidence. La.C.E. art. 403 provides a basis for its exclusion.
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,... or by considerations of undue delay, or waste of time.
For the same reasons the trial court erred in permitting the testimony of Williams's expert, Jackie Rowan, his mechanic. He too was erroneously permitted to give an opinion on the newly discovered theory of causationa manufacturing defect in the rack and pinion assembly.
There are other reasons why his testimony was not admissible. Rowan removed the rack and pinion assembly from the car after the accident, but he did not testify that he examined the rack and pinion assembly and found it to be defective. Rather, he testified that there was no visible damage to the housing of the rack and pinion component and that he discarded the whole assembly for scrap. He testified that his opinion that the rack and pinion assembly was defectively manufactured was based on his test drive of the Buick after it was brought to his shop for repair. In the test drive he found the steering wheel had a 15 degree "play," meaning that the steering was not immediately responsive. He did not find that the vehicle veered in a direction opposite from the direction in which the wheel was turned. When Rowan turned the wheel right, the car turned right, and when he turned left, the car responded.
*290 Williams had testified that when he tried to turn the wheel to the right, the car "took off to the left." directly contradicting facts Rowan relied upon to form an opinion as to the cause of the accident. Since Rowan's testimony is entirely predicated on facts different than those testified to by Williams, it was not admissible as expert testimony to prove causation of the accident and events described by Williams. The trial court erroneously permitted Rowan to give his opinion as an expert when that opinion was based on suppositions and facts not supported by the evidence.
The United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., ___ U.S. ___, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), held that federal trial judges must first determine whether the expert will testify to actual scientific knowledge. Although the Daubert case interpreted the Federal Rules, the Louisiana Supreme Court later applied Daubert to criminal trials. See State v. Foret, 628 So.2d 1116 (La. 1993). Drawing from Daubert in this civil suit, Daubert still holds that the judge must screen the witnesses to ensure that "any and all scientific testimony or evidence is not only relevant, but reliable." Daubert, ___ U.S. at ___, 113 S.Ct. at 2795.
Since we have found trial error, we would remand were it not for Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975), which requires an appellate court to decide the case when the record permits. In this case we render judgment in favor of General Motors for the following reasons.
When a suit is predicated upon a claim that a product was manufactured defectively, the plaintiff must prove the defect. Williams conceded he could not prove a design defect in the Buick's torsion bar. After trial began he alleged a manufacturing defect, but he could not produce for examination at trial the alleged defective rack and pinion steering, more than likely because it was not thought defective when examined by Rowan. While the disappearance of the evidence may not automatically create a presumption that the evidence was unfavorable, it does materially reflect upon the quality of the other evidence that was presented to prove the defect. Fairness and equity in most cases means a person who claims a defective product should produce it for examination.
Failure to produce the allegedly defective part reflects on the quality of the expert testimony. We found Rowan's testimony as an expert inadmissible. But even if it was admissible, it is not persuasive. Rowan had examined the assembly, did not observe or note any defect at that time, and discarded the assembly as scrap. His expert testimony that it was defective raises serious questions of credibility.
There are also other facts that seriously call into question the quality of Williams' evidence. This was a two and one-half year old Buick without any prior steering problems. Hundreds of thousands of the same rack and pinion assembly had been installed in GM cars, and there was no evidence of similar failures.
The circumstances surrounding the accident raise credibility questions. On the night of the accident, Williams told his wife he was going to his employer's place of business to pick up his pay check, although his employer (ODECO) was in the habit of mailing the checks. Williams left home about 6:00 p.m., picked up his brother, and admitted he had the proverbial "two beers" at a bar. The accident happened about four hours later, at 10:00 p.m., on a heavily traveled Interstate, when he lost control of the Buick. Williams claims a manufacturing defect caused loss of control, but when he was taken to a hospital a nurse in the emergency room stated she smelled alcohol on Williams' breath.
In sum, Williams' testimony is not consistent with his expert's testimony, and he did not produce the most crucial evidence in the lawsuit, the alleged defective rack and steering assembly. Williams has not borne the burden to prove a manufacturing defect. Not only has Williams not borne the burden to prove a manufacturing defect by a preponderance of the evidence, it is far more likely that the accident occurred through driver defect.
*291 Although appellate courts should not reverse judgments of trial courts based on jury verdicts that are the product of considered choices between experts for plaintiff and defendants, Rosell v. ESCO, 549 So.2d 840 (La.1989), there are exceptions as when the verdict is the product of trial error, or when the verdict has internal inconsistencies. In this case there are both. We render judgment in favor of General Motors; Appellee to pay all cost.
REVERSED AND RENDERED
BYRNES, Judge, dissenting with reasons.
I respectfully dissent. Had the trial court and jury reached the same conclusions the majority opinion now reaches I would probably vote to affirm in deference to the discretion afforded to the trial judge in the conduct of the trial and the manifest error/clearly wrong standard this Court is required to follow in reviewing the findings of the jury. For those very reasons I fear that our Supreme Court will not sit idly by while this Court attempts to arrogate to itself the discretion of the trial judge and the prerogatives of the jury as the majority has done in this case.
At approximately 10:00 p.m. on the evening of March 17, 1987, Ronald L. Williams, a safety and training specialist with Ocean Drilling and Exploration Company (ODECO) for eight (8) years, was driving a 1985 Buick Century manufactured by General Motors. Mr. Williams alleged that a steering failure caused the vehicle to veer sharply first to the left on I-10, striking the left guardrail and then veer to the right striking the right guard rail, resulting in serious injuries and damages. To recover these damages, Mr. Williams brought this products liability suit against the manufacturer of the vehicle, General Motors, as well as Crown Buick Inc., Prudential Property and Casualty Insurance Company, Sears and Roebuck, and his wife Betty Williams. All defendants with the exception of General Motors were dismissed. No one has appealed those dismissals.
In the trial court, the jury found in favor of Mr. Williams awarding him general damages in the sum of $750,000; past medical expenses in the sum of $197,000; past lost wages in the sum of $150,000 and future lost wages in the sum of $100,000, together with interest and costs.
The Judgment also ordered that:
1. Murphy Exploration and Production Company [as successor to ODECO] be reimbursed by preference the sum of $106,588.56 for medical expenses, but reduced by $30,000 as attorney fees to the plaintiff's attorney Stephen Bruno, Esq., together with interest and costs.
2. Murphy Exploration and Production Company [as successor to ODECO] be reimbursed by preference the sum of $34,594.07 paid in indemnity benefits from the $150,000 awarded for past lost wages but reduced by $10,000 attorney fees in favor of plaintiff's attorney, Stephen Bruno, Esq., together with interest and costs.
3. The Motion for Directed Verdict in favor of Crown Buick be granted, dismissing it as a party defendant.
4. The Motion for Directed Verdict in favor of Prudential Property and Casualty Insurance Company be granted, dismissing it as a party defendant on the main demand.
5. General Motors Corporation pay to Prudential Property and Casualty Company the sum of $5,925.00 on the third party demand, together with interest and costs.

I. THERE WAS NO MANIFEST ERROR IN THE JURY'S FINDINGS ON LIABILITY

The crux of this case was succinctly expressed by the questions contained in the following two interrogatories which were propounded to the Jury:
1. Did the 1985 Buick Century have a defect at the time it was manufactured?
2. Did the defect cause or contribute to any injuries sustained by Ronald Williams?
The jury answered "yes" to both of these questions. Only if we find that the jury was manifestly erroneous/clearly wrong in answering these two questions can we reverse the judgment of the trial court on the core issue of liability.
*292 This is a classic case of conflicting witnesses and conflicting experts. As this Court said in Brewhouse, Ltd. v. New Orleans Public Service Inc., 614 So.2d 118, 120 (La.App. 4 Cir.1993):
Our standard of review is set forth in Rosell v. ESCO, 549 So.2d 840 (La.1989); Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La.1987); and Miller v. Miller, 602 So.2d 330 (La.App. 4 Cir.1992) which stand for the following: When findings are based on determinations regarding the credibility of witnesses, the manifest-error clearly wrong standard demands great deference to the trier of fact's findings both express and implicit even though the appellate court may feel that its own evaluations and inferences are as reasonable; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
In reviewing contrasting expert testimony, the trier of fact has the responsibility to determine which evidence is the most credible.
The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record) but also upon the proper allocation of trial and appellate functions between the respective courts. Appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.
Thus, where there is conflict in the testimony, reasonable inferences of fact should not be disturbed upon review, even though the appellate court is convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Rosell v. ESCO, 549 So.2d at 844. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id. General Motors' expert testified that the accident could not have been caused by a defect in the vehicle. Plaintiff's experts testified to the contrary. The jury apparently believed plaintiff's experts.
The majority opinion states that the testimony of one of plaintiff's experts, Jackie Rowan, was inadmissible, relying on Daubert v. Merrell Dow Pharmaceuticals, ___ U.S. ___, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Louisiana Supreme Court in State v. Foret, 628 So.2d 1116, 1123 (La.1993) adopted "Daubert's requirement that expert scientific testimony must rise to a threshold level of reliability in order to be admissible under La.C.E. art. 702." Foret, supra, at 1123.
In taking this position, our Supreme Court noted that "this new standard serves to remove some of the barriers in the admission of expert testimony in many fields ..." Id. Therefore, contrary to the implication contained in the majority opinion, the standard allows the trial court more discretion in determining what expert testimony is admissible rather than less. The expert testimony rejected by the Supreme Court in Foret was used to obtain a criminal conviction based upon what could best be characterized as trendy theories of psychology/psychoanalysis or in the vernacular "psycho-babble." The Foret court noted at p. 1125 that "... the methods for testing the results of psychoanalysis are rife with the potential for inaccuracy."
I fail to be persuaded that the Supreme Court's understandable reluctance to sustain a criminal conviction based on expert testimony concerning dubious trendy theories of psychology as expressed in Foret translates into a mandate to exclude the testimony of the auto mechanic, Jackie Rowan, in this case. To the contrary, I am convinced that our Supreme Court would find the testimony of an experienced auto mechanic like Jackie Rowan relevant and persuasive, and that the trial judge did not abuse his discretion when he allowed Mr. Rowan to testify.
General Motors argued that the accident was caused by driver error with intoxication as a contributing factor. The jury apparently believed plaintiff's testimony that he was not intoxicated and that the steering failed. This was corroborated by his brother's testimony and by the failure of the investigating policeman to note any evidence of intoxication.
*293 The essence of the majority opinion is that it does not find the testimony of the plaintiff and of Jackie Rowan to be credible. The majority states that "the circumstances surrounding the accident raise credibility questions." As an example of such a credibility problem the majority opinion notes that the plaintiff said that he had only two beers several hours before the accident, but that a nurse in the emergency room said that she smelled alcohol on Williams' breath after the accident. However, the jury's decision to credit the testimony of the plaintiff and his witnesses "can virtually never be manifestly erroneous or clearly wrong." Rosell v. ESCO, supra at 845. Although the majority opinion pays passing lip service to other rationales for the conclusion it reaches, it is in reality from beginning to end a trial de novo lacking only that label. It represents the very human, natural, and normal desire of this or any other court to substitute its opinion for that of the court it is reviewing a desire that, human, natural, and normal though it may be, we have been admonished countless times to eschew by our Supreme Court in its frequent reminders of our role in the review process. All judges would like the prerogative of substituting their opinions for those of other judges. It is only natural for judges to prefer their own opinions to those of others, for the moment one decides that the opinion of another is to be preferred, one would automatically exchange that opinion for the one originally held. Our Supreme Court has recognized this human frailty and commands us not to indulge it at the appellate level. Reviewing the record of conflicting testimony of experts and witnesses in light of the foregoing, there is no basis for holding the jury's findings were manifestly erroneous/clearly wrong.

II. GENERAL MOTORS WAS NOT PREJUDICED

General Motors was not materially prejudiced when plaintiff's expert testified for the first time at trial that in addition to his theory that a crack in the spring of the rack and pinion assembly caused plaintiff's accident, it was also possible that the rack and pinion could have become temporarily disengaged. This second possibility had never been mentioned before the trial, in spite of the fact that the expert had been twice deposed.
One major purpose of discovery is to prevent trial by ambush. This court will not allow a party to be prejudiced by last minute, surprise evidence to which that party is given no adequate opportunity to respond. In this case it does not appear that an ambush was intended. Additionally, General Motors was given an adequate opportunity to respond to the new theory. The trial court allowed General Motors three (3) days to prepare its cross-examination of plaintiff's expert, Mr. Mizen, with respect to the new theory. During this time, General Motors conducted tests using the already prepared exemplar vehicle in order to refute the testimony. General Motors already had an expert, Peter Rogousky, who was fully conversant with the technical workings of the rack and pinion steering gear. He demonstrated his opinion to the jury using a cut away of a rack and pinion steering gear. General Motors, as the manufacturer of the mechanism was certainly familiar with its mechanical structure and operation.
In denying General Motors' motion for a new trial the trial court found that "... defense counsel [General Motors] handled the trial skillfully and was not prejudiced by the second theory of Plaintiff's expert."
I cannot say that the trial court was wrong or unreasonable in reaching this conclusion.
The majority opinion relies on Riverland Food Corp. v. Carriage Meat Co. Inc., 449 So.2d 1131, 1133 (La.App. 5 Cir.1984) to support the contention that the defendants were prejudiced by the trial court's decision to receive Mr. Mizen's testimony. However, in that case, the appellate court sustained the trial court's ruling that the evidence objected to was admissible and not prejudicial. It seems certain that the Riverland Food Corp. court would have done the same in the instant case, had it been the court to determine the admissibility of Mr. Mizen's testimony.
The majority also cites Thibeault v. Square D. Co., 960 F.2d 239 (1st Cir.1992). The majority opinion says of Thibeault that "the trial court correctly excluded the testimony *294 of plaintiff's expert as to the new theory" as though it would have been error had the trial court ruled otherwise. No such statement was made by the Thibeault court, expressly or impliedly. The Thibeault court said only that the trial court did not abuse its discretion in refusing the expert testimony. The implication is very strong that had the trial court allowed the experts to testify, the Thibeault court would have held that such a ruling was also within the discretion of the trial court. I am equally convinced that had the instant case been reviewed by the Thibeault court, that court would have decided to affirm the lower court as I would do. By definition, where the court has discretion it has the right to choose. It is a contradiction in terms to say that a court has discretion but no choice.
Moreover, the facts in Thibeault were outrageous. In Thibeault the plaintiff revealed for the first time only four days before trial the names of seven experts he intended to call to testify. The Thibeault court noted that plaintiff's counsel had done the same thing in other cases, the implication being that it was a deliberate trial tactic:
"Once the district court has recognized a pattern of misbehavior on an attorney's part, the court would be blinking reality in not taking counsel's proven propensities into account." Thibeault at p. 246.
There is not even a suggestion of such a pattern or propensity on the part of the Bruno firm, much less a finding to that effect. Again, I can only conclude that had the Thibeault court reviewed the instant case it would have disagreed with the majority opinion.
Plaintiff's attorney, Mr. Bruno, was undoubtedly just as surprised as was the defense by Mr. Mizen's testimony. The most reasonable interpretation of that portion of the transcript is that Mr. Bruno was attempting to nail down in the minds of the jury that the accident could have only been attributed to one cause which would compel a verdict in favor of his client, i.e., it was an attempt to exclude the existence of non-liability causes, not an attempt to ambush the defense with new, alternative theories of liability.
Schwamb v. Delta Air Lines, Inc., 516 So.2d 452 (La.App. 1st Cir.1987) writs denied, 520 So.2d 750 (La.1988) also fails to support the position taken by the majority.
In Schwamb at p. 460 the court held only that an expert could not "give an expert opinion on the credibility of another witness... [as the] jury can adequately assess credibility and it is the jury's exclusive province to do so." Nor is such testimony appropriate where it involves matters "... not beyond the understanding of the average layman...", i.e., where there is no need for expert testimony. Id.
I am convinced that far from applauding the decision reached by the majority, the Schwamb court would chide them for invading the jury's "exclusive province" of credibility determinations and fact finding. In the instant case the experts testified as to mechanical matters "beyond the understanding of the average layman" as was appropriate, and refrained from giving opinion testimony as to the credibility of other witnesses.

III. THE ADVERSE PRESUMPTION RULE DOES NOT APPLY

The Williams' damaged vehicle was taken to Jackie Rowan's Automotive Repair. An employee of the repair shop discarded the rack and pinion steering assembly. Mr. Williams, therefore, could not produce those parts at the trial in support of his claim that they were defective. General Motors asserts that Mr. Williams' failure to produce those parts in court creates a presumption that the evidence would have been unfavorable to his cause.[1] Where a litigant fails to produce evidence available to him and gives no reasonable explanation, the presumption is that the evidence would have been unfavorable to him. Boh Brothers Construction v. Luber-Finer, Inc., 612 So.2d 270, 274 (La.App. 4 Cir.1992), writ denied 614 So.2d 1256 (La. 1993) and Wilson v. U.S. Fire and Casualty Company, 593 So.2d 695, 700 (La.App. 4 *295 Cir.1991), writ denied 597 So.2d 1037 (La. 1992).
The record supports Mr. Williams' contention that the part was inadvertently discarded when it was mistaken for scrap metal by an employee of Jackie Rowan's Automotive Repair Shop.
Therefore, Mr. Williams provided a reasonable explanation for his failure to produce the evidence in court and no such unfavorable presumption applied. Bourgeois v. Bill Watson's Investments, Inc., 458 So.2d 167, 172 (La.App. 5 Cir.1984); Babineaux v. Black, 396 So.2d 584, 586 (La.App. 3 Cir. 1981).
It should be noted that the Boh Brothers case cited by General Motors followed and relied on the Bourgeois and Babineaux cases. The facts in Bourgeois are remarkably similar to the instant case, with the exception that in Bourgeois the plaintiff had to account for the disappearance of the entire automobile, not just a damaged part. The plaintiff explained that she had been required to sell her car to her insurance company in order to recover property damages. This was found to be an adequate explanation.
In Boh Brothers the party litigant had custody of the item when it disappeared, no compelling reason to discard it, and knew of its importance. Contrariwise, in this case, the lost part was not in the plaintiff's custody. Nothing in the record indicates that the part was lost due to the plaintiff's negligence or deliberate act. It was in the custody of a third party repair shop which admitted responsibility for mistaking the rack and pinion steering gear for scrap metal and discarding it.
Moreover, in Boh Brothers, the actual ruling of this Court was to set aside the jury verdict because the trial court failed to instruct the jury that the litigant could explain its failure to produce the missing item which is the reverse of the situation in the instant case. Boh Brothers does not support General Motors' position.
Wilson v. U.S. Fire and Cas. Co., supra, also fails to support General Motors' position. In the Wilson case where a party failed to call a witness on his witness list, this Court held:
1. As no jury instruction was requested on the issue, it could not be considered on appeal.
2. As both parties could have called the witness no presumption was created in favor of or against either party.
3. "The adverse presumption rule suggested by plaintiff must be tempered by the proposition that a party to a lawsuit need only to prove his case. If he does so by calling one or more witnesses to testify concerning an issue, he should not be penalized because he fails to call still another witness on the subject." Wilson, supra, at 700.
The record does not support a finding that the missing part was in plaintiff's custody. Nor does it support a finding that the part was lost through any negligent or intentional act on the part of the plaintiff. Had the jury concluded otherwise it would have been manifestly erroneous/clearly wrong.
Although the opinion of the majority does not appear to dispute the foregoing, it attempts to reach the same result by advancing the novel theory that though the failure to produce certain evidence may create no unfavorable presumption, "it does materially reflect upon the quality of the other evidence that was presented to prove the defect." No authority is cited for this proposition, and I would suggest that there is none. If the absence of certain evidence casts no shadow on that evidence, perforce it can cast no shadow on other evidence. If the failure of the trial judge to instruct the jury on the adverse presumption rule was error, it was harmless error.

IV. THE RECORD SUPPORTS THE AWARD FOR LOSS OF FUTURE EARNINGS

Plaintiff asserts that the testimony of his expert economist, Mr. Wolfson, that plaintiff had a loss of future earnings in the sum of $385,000 was uncontroverted. Therefore, the jury was clearly wrong in awarding the plaintiff only $100,000 for loss of future earnings. This Court does not agree.
*296 It is well settled that an award of damages may not be disturbed on appeal absent an abuse of discretion by the trier of fact. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Reck v. Stevens, 373 So.2d 498 (La.1979). Furthermore, uncontradicted expert testimony regarding lost future income is not binding on the court. Matthias v. Brown, 551 So.2d 821, 823 (La.App. 3 Cir. 1989) writ denied; Morvant v. Smith, 463 So.2d 75, 77 (La.App. 3rd Cir.1985).
At the time of the accident at issue, Mr. Williams was employed as a safety specialist on oil rigs with ODECO. Thomas Roundtree, Personnel Specialist with ODECO, testified that ODECO, like other oil companies in Louisiana, suffered severe cutbacks in the late 1970's and 1980's causing ODECO to lay off numerous employees. Ultimately, ODECO ceased to exist as a separate entity in Louisiana and is now part of Diamond M in Houston, Texas.
Based on the testimony of Mr. Roundtree and the general knowledge of the deterioration of the Oil industry in Louisiana, the jury had a factual basis to discount the testimony of Mr. Wolfson. The plaintiff's compensation had been consistently declining in the years prior to the accident. The jury had ample factual evidence to conclude that Mr. Wolfson's assumption regarding work life advancement and raises would not occur.

V. IT WAS ERROR TO AWARD FEES TO PLAINTIFF'S ATTORNEY OUT OF MURPHY'S RECOVERY

The jury returned a verdict in plaintiff's favor on October 22, 1992 in the amount of $1,197,000.00. By Amended Judgment, the trial court awarded Murphy Oil $106,588.56 as reimbursement for medical expenses paid on behalf of or to plaintiff which funds were to paid in preference from plaintiff's recovery of $197,000.00 for past medical expenses. The Court ordered Murphy Oil to pay $30,000.00 in attorney's fees to plaintiff's counsel from its award for medical expenses paid. Additionally, the trial court awarded $34,594.07 to Murphy Oil as reimbursement for the compensation payments paid to plaintiff to be paid in preference from the $150,000.00 for past lost wages awarded to plaintiff. However, the trial court awarded plaintiff's counsel $10,000.00 as attorney's fees from Murphy's $34,594.07 award. The trial court provided reasons for judgment concerning the awards of attorney's fees to be deducted from Murphy's awards on November 11, 1992.
It was error for the trial court to order Murphy Oil to pay attorney's fees to plaintiff's attorney. Murphy Oil was represented by its own attorney, not by plaintiff's counsel. The trial court's reliance on Moody v. Arable, 498 So.2d 1081 (La.1986) is misplaced. In Moody the Supreme Court held that when an injured worker sues a third party in tort and that worker's employer or his workers' compensation carrier intervenes for recoupment of workers' compensation paid to the worker, the employer or carrier is obliged to pay a portion of the attorney's fees of the worker if the worker succeeds in recovering funds from which the employer or carrier realize recoupment. The Supreme Court based this holding on its conclusion that under the Louisiana Worker's Compensation Act, La.R.S. 23:1101 et seq., the employer or compensation carrier is a co-owner with the injured worker "of a property right consisting of a right to recover damages from the third person." It is only this right of co-ownership which entitles the injured worker to recover attorney's fees from the employer/compensation carrier if the attorney for the worker is determined to have been responsible for securing the award from which the employer/compensation carrier recoups compensation payments.
Plaintiff in his brief acknowledges that Murphy's right of recovery is based on subrogation, not co-ownership. The recent effort of this Court to resist the expansion of Moody as expressed in Wiedemann & Fransen, APLC v. Highlands Ins., 617 So.2d 105, 106 (La.App. 4 Cir.1993), writ denied, 619 So.2d 552 (La.1993), is equally applicable to this Case:
"We agree with McLain v. Caddo Parish School Bd., 599 So.2d 878 (La.App. 2 Cir. 1992), writ denied, 605 So.2d 1123 (La. 1992) where the court took the position that efforts to expand the scope of Moody v. Arable, should be resisted.

*297 It is clear that the lynchpin of Moody v. Arabie is co-ownership of a single property right.
* * * * * *
Efforts to extend the rationale of Moody v. Arabie, to cases beyond recovery from a third party tort feasor by the employee or employer in a worker's compensation setting have been resisted."
This is consistent with the opinion of this Court in Charity Hosp. of Louisiana v. Band, 593 So.2d 1392 (La.App. 4 Cir.1992). There, the attorney sought to apply his 40% contingent fee contract to funds recovered on behalf of his client, but which were subject to a privilege in favor of and owed to Charity Hospital. This Court held at page 1392:
In Moody v. Arabie, supra, the issue was whether an employer (or its compensation insurer) was obligated to pay a portion of the employee's attorney fees in a third party tort suit. The Supreme Court concluded that since the employer had a preference up to the amount of the compensation paid, on the settlement and/or judgment proceeds in the employee's third party claim, each party (employer and employee) were co-owners in the litigious right. As co-owners each were responsible for their pro-rata share of the litigation costs, including attorney fees. Broussard v. Olin, supra, used the same rationale and reached the same conclusion.
We find Moody distinguishable from the instant case. Where an employee is injured by the tortious acts of a third party, either the employer who pays compensation or the employee, or both can file suit. La.R.S. 23:1102(A)(B). Thus by specific statute, the employer is granted a property right in the claim of the injured employee. In the instant case, Charity is the creditor of McCrimmons. Absent a legal or conventional subrogation by McCrimmons, Charity has no independent right to seek from the tortfeasor the medical expenses incurred by McCrimmons. The law (R.S. 9:4751, et seq.) only provides that Charity have a privilege on any funds received by McCrimmons from another person on account of the injuries. (Emphasis added).
This Court pointed to the aggregation of the following factors which the Supreme Court considered in arriving at its conclusion in the Moody case:
1. Either the employer/compensation carrier or the injured employee, or both can file suit.
2. The employer/compensation carrier had a preference up to the amount of compensation paid, on the settlement and/or judgment proceeds in the employee's third party claim.
3. The existence of a specific statute, LSA-R.S. 23:1102(A)(B), which establishes the first two rights.
4. The parties have co-ownership of a litigious right.
Such an aggregation of factors does not exist in the instant case.
Miguez and Leckband (A Law Partnership) v. Holston's Ambulance, Service, Inc., 614 So.2d 150 (La.App. 3 Cir.1993), is inapposite. There was no issue of co-ownership. The attorneys for an injured worker obtained judgment proceeds in the amount of $11,970. Holston's Ambulance, a health care provider, claimed the entire proceeds of the judgment leaving nothing for the attorneys who obtained the proceeds. The court simply held that the privilege for attorneys fees provided by LSA-R.S. 9:5001 "primes the privilege set forth in LSA-R.S. 9:4752 for medical providers." This becomes an issue only where the proceeds of the judgment are inadequate to reimburse the health care provider and pay the attorney's contractual contingent fee. That is not a problem in the instant case. Mr. Bruno does not argue that the balance of the proceeds from this judgment after reimbursement is made to Murphy will be inadequate to pay his fee. In effect, Miguez is nothing more than a "ranking of liens" case.
Southern Farm Bureau Cas. Ins. Co. v. Sonnier, 406 So.2d 178 (La.1981), is also distinguishable. There, attorney's fees were not at issue. The parents of the decedent obtained a judgment of $103,160 against the railroad tort-feasor. (See the appellate opinion, 396 So.2d 996, 997.) After obtaining judgment for $103,160, the parents of the decedent agreed to settle with the tort-feasor *298 for $90,000. Seven days after the settlement, Southern Farm Bureau Casualty Insurance Company sued[2] the decedent's parents for the $2,758.40 it had paid them for their son's funeral expenses, "alleging the settlement destroyed its conventional subrogation under the policy against the railroad in violation of the policy provisions."
The Supreme Court held that the insurance company had only a right of partial subrogation to its insured's claim against the tort-feasor to the extent of the $2758.40 it had payed for funeral expenses. Because the $90,000 obtained in settlement was only part of the parents' entitlement under the judgment, i.e., $103,160, they were entitled to preference for the balance of their claim against the tort-feasor:
Nevertheless, subrogation cannot injure the creditor, since, if he has been paid but in part, he may exercise his right for what remains due, in preference to him from whom he has received only a partial payment. La.C.C. art. 2162. Thus, when the creditor has received from the subrogee a partial payment only, the credit is divided between them; the original creditor remains creditor for the unpaid portion and the subrogee becomes creditor to the extent of the payment he had made. Southern Farm Bureau Cas. Ins., supra, at 180.
The Supreme Court in Southern Farm Bureau ruled that the decedent's parents were entitled to a preference over the insurance company on all sums recovered from the tort-feasor until they were paid $100,401.60, i.e., the $103,160.00 amount they were awarded in the judgment less the $2,758.40 to which the insurance company was subrogated. Therefore, when the decedent's parents settled for $90,000 they ended up with $10,401.60 less from the tort-feasor than the amount which they were entitled to recover in preference to the insurance company.
Plaintiff argues that Southern Farm stands for the proposition that Murphy's recovery as subrogee must be reduced by the amount of the attorney's fees plaintiff's attorney charges him on the portion awarded to Murphy based on the Supreme Court's pronouncement that "... the subrogee can only claim that which remains after the subrogor has been paid." Southern Farm Bureau Cas. Ins., supra at 180.
If plaintiff's subrogation argument were carried to its logical conclusion, Mr. Williams would be entitled to a dollar for dollar reduction of what he owed to Murphy for every dollar he owed to his attorneys, leaving nothing to Murphy. This is clearly not what was intended by the Supreme Court in Southern Farm Bureau. That case stands only for the proposition that the recovery of a partial subrogee of the injured party (Murphy in the instant case) may be reduced by an amount equal to the difference between what the injured party actually collects from the tort-feasor and what the injured party was entitled to collect from the tort-feasor. It is the amount recovered from the tort-feasor that determines what the partial subrogee is entitled to, not the amount the injured party nets after various expenses, such as attorney's fees. Plaintiff acknowledges in his brief that "he recovered the full amount of his past wages and medical expenses from the Judgment."
Plaintiff has failed to cite any authority that would support his contention that he is entitled to deduct attorney's fees from the portion paid to Murphy based on a theory of quantum meruit. The cases cited by plaintiff, Succession of Butler, 294 So.2d 512 (La. 1974), and Oppenheim v. Bouterie, 505 So.2d 100 (La.App. 4 Cir.1987), have no bearing on this case.
In Succession of Butler an attorney sought to enforce a contingency fee contract for approximately $72,000 against his own client. In that case the court held that the contingency fee contract was contra bonos mores and, therefore, unenforceable. However, the court allowed the attorney to recover fees from his client on a quantum meruit basis in the much lesser sum of $25,000, recognizing that a true attorney-client relationship existed.
*299 In Oppenheim v. Bouterie, 505 So.2d 100, 101 (La.App. 4 Cir.1987) this Court quoted the case of Guillory v. Guillory, 339 So.2d 529, 531 (La.App. 4 Cir.1976) to the effect that "... attorney's fees incurred by the wife in prosecuting a suit for separation from bed and board or divorce is an obligation of the community which ... must be paid out of community assets on a quantum meruit basis...." The application of community property law to a claim for attorney's fees is irrelevant to Mr. Williams' claim for attorney's fees from an unrelated third party. If there is any analogy to be drawn, it would be to the language of this Court from Guillory that was omitted by the ellipsis at the end of the quotation above where this Court went on to finish that sentence by stating that:
"... but if there are no community assets, there is no liability on the part of the husband separately for such fees." (Emphasis added). Guillory, supra at 531.
In Moody v. Arabie, supra at 1083 the Supreme Court stated:
"The trial court held that the worker's attorney was entitled under this contingency fee contract with the worker to collect one third of the gross recovery because La.R.S. 9:5001 grants an attorney a first privilege on a judgment obtained by him and on property recovered thereby. The Court of Appeal reversed, holding that because the employer was not a party to or a debtor under the contingent fee contract the accessory right of privilege established by La.R.S. 9:5001 could not affect proceeds due to the employer under the judgment. 485 So.2d 660. We agree with and affirm that part of the Court of Appeal judgment." (Emphasis added).
The denial of attorney's fees in this case would be consistent with Moody. It was error for the trial court to award attorney's fees out of Murphy's recovery for reimbursement for plaintiff's medical expenses and lost past wages.

VI. PRUDENTIAL IS ENTITLED TO BE REIMBURSED FOR PROPERTY DAMAGE PAYMENTS

Donald Williams, plaintiff's brother, was a passenger in the vehicle at the time of the accident. Donald Williams filed suit against Prudential Property & Casualty Insurance Company as the liability insurer of Betty Williams, plaintiff's wife, in whose name the defective Buick was registered. Prior to trial Prudential settled Donald Williams' bodily injury claim for $5,925.00. Prudential filed a cross-claim against General Motors seeking reimbursement of the $5,925.00 it paid to Donald Williams as well as $5,278.73 it paid to Ronald and Betty Williams under the collision portion of the policy it had issued to Betty Williams.
In support of its cross-claim for reimbursement for property damage, Prudential introduced a copy of the damage estimate and the testimony of Gill Chisholm, an ex-Prudential employee who testified regarding the estimate and amount of property damages paid to Ronald and Billy Williams.
Prudential was dismissed as a party defendant by way of directed verdict. That decision is not challenged on this appeal. In its judgment in favor of Ronald Williams and against General Motors Corporation the court also awarded Prudential $5,000 on its third party demand/cross claim against General Motors. Prudential filed a Motion to Amend the Judgment, and the trial court amended the judgment, increasing the award in favor of Prudential to $5,925.00, the exact amount Prudential paid to Donald Williams in settlement of his bodily injury claim.
Prudential contends that in spite of having introduced sufficient uncontroverted evidence at the trial to support its additional claim of $5,278.73 for property damage reimbursement, the trial court judgment is silent on the matter. The record supports this contention. This Court should accept Prudential's explanation that there was an inadvertent oversight on the part of the trial court.
BYRNES, J., dissents.
WALTZER, J., dissents for the reasons assigned by BYRNES, J.
NOTES
[1] In the instant case the subrogee, Murphy, intervened in the tort suit to protect its claim. In Southern Farm the subrogee insurance company failed to intervene. It did not file suit until after the entire tort litigation had been disposed of.
[2] The effect of partial subrogation is more easily understood if round numbers are used. Assume that it has been determined that an injured worker has a right to recover $100,000 from a tortfeasor. Assume that a third party has advanced $10,000 to the injured worker which should be applied to the $100,000 claim entitling that third party to a right of subrogation against the tortfeasor. As the amount advanced by the third party is less than the full amount of the claim, i.e., there is still a $90,000 balance due the plaintiff, the third party has a right of partial subrogation only. This means that the injured worker is entitled to recover the full $90,000 balance still due him from the tortfeasor in preference to the partial subrogee before the partial subrogee may assert his subrogation against the tortfeasor. In other words, in this hypothetical case the partial subrogee's subrogation claim is deferred to the last $10,000 to be collected from the tortfeasor, not the first.
[1] For a comprehensive analysis of the concept of "spoliation of evidence" see Kammerer v. Sewerage & Water Bd., 633 So.2d 1357, 1360-1369 (La.App. 4 Cir.1994).
[2] In the instant case the subrogee, Murphy, intervened in the tort suit to protect its claim. In Southern Farm the subrogee insurance company failed to intervene. It did not file suit until after the entire tort litigation had been disposed of.